# Richmond

## Town of Galax, et als. v. Appalachian Electric Power Company, et als.

January 13, 1941.

Record No. 2338.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

*Jack M. Matthews* and *Caskie, Frost & Watts,* for the appellants.

*J. M. Parsons, S. Floyd Landreth, T. X. Parsons, William D. Staples, J. Wallace Ould, John L. Abbot* and *S. B. Campbell,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

In January, 1940, the council of the town of Galax passed an ordinance by a vote of four to two—the mayor not voting—providing for the expenditure of $287,000 in erecting a municipal light and distribution system.

$129,000 was to be obtained by a grant from the United States Government, and $158,000 to be obtained by the sale of bonds to Scott, Horner and Mason. These bonds were denoted "revenue bonds," maturing over a period of years and payable solely out of the net revenues to be received from the operation of the plant and equipment "so being purchased and erected." They were in no event to become a general obligation of the town or to be paid out of any other assets or revenues. Under the contract the town was to operate the plant, deposit all income therefrom in a special account, pay the necessary expenses and upkeep, and use the residue of the income for the payment of principal and interest on the bonds. In event of default 25 per cent in interest of the holders of the bonds were authorized to seek the appointment of a receiver to take over and operate the plant.

The Appalachian Electric Power Company, the holder of an electric light and power franchise from the town, and other taxpayers filed a bill setting forth the facts in detail and alleging that the municipal bonded indebtedness exceeded 18 per cent of the assessed valuation of real estate within the town and that the ordinance had been adopted without approval of the electors. The bill charged that the proposed issue of bonds was illegal unless the project had been approved by the voters, and prayed that the town and Scott, Horner and Mason be perpetually enjoined from issuing, selling or negotiating the bonds, or any of them.

The cause was removed from the Circuit Court of Grayson county to the Corporation Court of the city of Danville. After a full hearing, the trial judge granted the injunction. The town of Galax and Scott, Horner and Mason obtained this appeal.

The decisive question presented is whether the "revenue bonds," proposed to be issued under the seal of the town and paid out of revenues to be collected from the sale of electrical energy to the town and its inhabitants,

are bonds or obligations within the purview of section 127 of the Virginia Constitution.

■ This question was this day decided adversely to appellants' contention in *Town of South Hill et al.* v. *Thomas A. Allen et als., post,* p. 154, 12 S. E. (2d) 770. However, as the Honorable Henry C. Leigh, trial judge, in his excellent opinion, emphasized certain reasons not stressed in our opinion in the *South Hill Case,* we have decided to quote, with approval, pertinent extracts from his opinion on the question.

■ "I am forced to the conclusion that Ground VI (the unconstitutionality of the ordinance) is well founded. My opinion is formed with full knowledge that it is contrary to the general import of many decisions dealing with somewhat analogous questions, and is a pull against a strong drift in the current of judicial thought and of legislative action. * * * . Constitutions were adopted to protect the people against their own rash actions. Their plain mandates should not be disregarded because conditions change, not because new concepts of economic problems may give rise to a desire to overcome the barriers erected. Nor do exigent circumstances justify judicial sophistry as a means to circumvent them. There is an orderly process ordained for the amendment of objectionable provisions. * * * . I have seen no cases in which the constitutional provisions were the same as those contained in section 127 of ours. The 'special fund' theory as an escape from restrictions against incurring indebtedness is no new doctrine. It was in existence before our constitution was adopted. The convention which drafted that instrument was composed in large part of Virginia's leading lawyers. To read the debates of the convention is to be amazed at the breadth of legal learning displayed as to a multitude of legal questions. We may rest assured that the 'special fund' doctrine was well known to the members of the convention. Indeed, as I think can be well shown, the section itself plainly shows, that this very doctrine was in mind, and

the draftsmen of the section took steps to prevent its application except in the limited way provided in the section, specifically and plainly.

"The first paragraph of the section deals with the issuance of bonds or other interest-bearing obligations, and inhibits the towns and cities of the state from incurring an indebtedness in excess of eighteen per cent of the assessed valuation of the real estate subject to taxation. It then provides that in determining the limitation on the power to incur indebtedness there shall be excepted the following classes of indebtedness.

"(a) Certificates issued in anticipation of the current year's revenue.

"(b) Bonds approved by a vote of the majority of the voters for a supply of water or other specific undertaking. But if the receipts from the undertaking after a period which must not be longer than five years after the date of election are not sufficient to pay the costs of operation, &c., &c., all such bonds (i. e. bonds issued for a specific undertaking after approval by the voters) must be included in the amount which limits the power to issue without a vote of the people, * * * 'UNLESS THE PRINCIPAL AND INTEREST THEREOF BE MADE PAYABLE EXCLUSIVELY FROM THE RECEIPTS OF THE UNDERTAKING.'

"To what do the quoted words apply? Plainly to those bonds issued in accordance with the provisions of clause (b) which after a period not longer than five years have failed to meet the requirements prescribed. If the bonds issued for a specific undertaking are not made payable as to principal and interest exclusively from the receipts of the undertaking, and the undertaking does not earn enough to meet the requirements they must be included in the amount which limits the power to incur indebtedness in excess of eighteen per cent of the assessed value of the real estate. If on the other hand the bonds issued in accordance with the provisions of clause (b) are made payable exclusively out of the

earnings or receipts of the undertaking, then in no event shall such bonds be counted against the amount which limits the power to incur indebtedness. Clause (b) relates to bonds issued for a specific undertaking. They cannot be issued without a vote of the people if the amount in which they are issued together with other outstanding bonds exceeds eighteen per cent of the assessed value of the realty. The quoted language shows beyond question that bonds payable out of the receipts of the undertaking were regarded by the framers of the constitution as indebtedness. And that a vote of the people was necessary in one case as much as in the other. Surely, if such bonds were not within the meaning of the phrase 'bonds or other interest-bearing obligations' or the word 'indebtednes' a separate and distinct clause would have been inserted in the section, eliminating bonds issued for a specific undertaking made payable as to principal and interest out of receipts. The language concluding clause (b) can apply to none other than the bonds mentioned before in that clause. Those bonds must be issued and can only be issued after approval by the voters.

"I fail to perceive how it can be said that the whole subject was not carefully considered and fully covered. In this connection it is argued on behalf of defendant that the exception concluding clause (b) refers to any bonds, but as I have said this does violence to the language of the section itself and may be said to be a reflection upon the intelligence of the draftsmen of the section and their ability to express themselves.

"The truth is, that although the debates of the Constitutional Convention do not seem to deal with this section in any detail, it is pretty plain that the subject was fully understood, and the intent was to inhibit just what had been done under the 'special fund' theory. I believe that the convention acted upon this thought; that as a practical matter undertakings on the part of towns and cities would inevitably call for a bond issue; that

the whole question of protecting the citizens of towns and cities against the rash and dishonest enterprises which might be undertaken by their governing bodies against imprudent ventures prompted by honest but unwise motives could be taken care of by allowing the voters, or rather requiring the voters, to approve the undertaking. It may be said that this would not apply to those bonds issued by the governing bodies which were within the debt limit. True, but in this case it may be said in reply that in that circumstance the interest of the community would not be so seriously jeopardized. There would be a safety factor inherent in the situation. Certainly in many cases the question of public policy as to undertaking the project would be submitted to the voters in reference to a bond issue. In those cases where this would not be so, the undertaking as a rule would not be of sufficient magnitude to be of grave moment.

"Because, in my opinion the contract in this case is in contravention of section 127 of the Constitution, and because the sale of the bonds pursuant to the terms of the contract is *imminent,* the execution of the contract, or the issuance of the bonds should be enjoined, and therefore defendant's demurrer (is) overruled. See *Lynchburg & Rivermont Street Ry. Co.* v. *Dameron et als.,* 95 Va. 545 (28 S. E. 951)."

The decree of the trial court is

*Affirmed.*