# Richmond

## Town of South Hill, Et Al. v. Thomas A. Allen, and Others.

January 13, 1941.

Record No. 2344.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

*Hodges & Dortch, Page & Leary* and *Patrick A. Gibson,* for the appellants.

*W. H. Cook, Irby Turnbull, H. W. Anderson, Jr.,* and *James S. Easley,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

Prior to July, 1927, the town of South Hill owned and operated a municipal electric light and power plant which served the town and its inhabitants with electricity for domestic and commercial uses. The town determined that it was for the best interest of its inhabitants to sell and dispose of this plant. Accordingly it made a contract with the Virginia Public Service Company whereby the town agreed to sell the plant and distribution system for the sum of $90,000. This sale was conditioned upon the purchaser becoming the successful bidder for a franchise to be awarded in the form provided by section 125 of the Constitution. The Virginia Public Service Company was the successful bidder and obtained a franchise for thirty years from August 8, 1927. Immediately after the town was connected with the new system, the company dismantled the municipal generating plant and· sold the same for $3,450, thereby indicating that approximately $85,000 was the consideration paid for the franchise. Since that date the Virginia Public Service Company has spent more than $11,000 in improving, repairing and rebuilding the distribution system in the town of South Hill.

Continuously thereafter the Virginia Public Service Company fully complied with the obligations imposed upon it and furnished ample light and power to the town and its inhabitants at reasonable rates. It has rendered at all times efficient and acceptable service.

In the fall of 1939 another council of the town again

determined that it was to the best interest of the town and its inhabitants to acquire and operate its own municipal electric power plant and distribution system. With this end in view, the council accepted a proposal of the Chicago Pneumatic Tool Company to furnish and install certain electrical generators and distribution equipment, as per specifications, for the sum of $150,000, to be evidenced by obligations of the town denoted "revenue certificates," under date of January 1, 1940, bearing interest at four per cent, maturing annually over a period of twenty years from date, and payable—both as to principal and interest—solely from the net receipts to be derived from the electric power plant and distribution system.

The revenue certificates proposed to be issued, and the present bonded indebtedness ($84,000) exceed eighteen per cent of the assessed valuation of real estate within the town subject to taxation. Certain taxpayers and the Virginia Public Service Company questioned the validity of the contract made by the council in the name of the town with the Chicago Pneumatic Tool Company, and the revenue certificates proposed to be issued. The town and the Chicago Pneumatic Tool Company filed a bill naming the dissatisfied voters within the town and the Virginia Public Service Company parties respondent, and prayed adjudication of the controversy under the Declaratory Judgment Act, Code 1936, sections 6140a *et seq.* Respondents demurred and filed respective answers. The cause came on to be heard by the trial court on the pleadings and an agreed stipulation of facts. On the hearing it was held that the contract between the town of South Hill and the Chicago Pneumatic Tool Company, and the revenue certificates proposed to be issued thereunder, were invalid. Complainants in the bill, appellants in this court, sought and obtained this appeal.

The decisive question presented is whether the "revenue certificates," proposed to be issued under the seal of the town and paid out of revenues to be collected from

the sale of electric energy to the town and its inhabitants, are bonds or obligations within the purview of section 127 of the Virginia Constitution.

It is conceded that the municipality has power under the provisions of its charter and pertinent general statutes to acquire, own and operate a municipal light and power plant. It is likewise conceded that no bonds or other interest-bearing obligations, payable out of the general revenues of a municipality (with certain exceptions), in excess of eighteen per cent of the assessed valuation of real estate within the municipality subject to taxation, may be issued unless approved by a majority of the voters participating in an election called for the purpose of ascertaining their views. The proposed issue of bonds, plus the present indebtedness of the town, greatly exceeds the limitation stated, and the question of the proposed bond issue was not submitted to the electors of the town for their approval.

Appellants contend that inasmuch as it is contemplated that the proposed purchase price of the plant should be paid from the net revenues received from operation, the certificates of indebtedness are not bonds or obligations of the town within the purview of the Constitution.

This contention requires careful study and an analysis of the following constitutional mandate (section 127): "No city or town shall issue any bonds or other interest-bearing obligations for any purpose, or in any manner, to an amount which, including existing indebtedness, shall, at any time, exceed 18 per centum of the assessed valuation of the real estate in the * * * town subject to taxation * * * provided * * * that in determining the limitations of the power of * * * town to incur indebtedness there shall not be included the following classes of indebtedness: * * * ."

This Constitutional inhibition is a restriction upon the power of the legislature to delegate to municipalities the right to incur debts or obligations contrary to the provisions stated therein. It is apparent from an in-

spection of the general statutes cited that the legislature has not, in express terms, attempted to pass any general law on the subject contrary to the inhibition, hence we will confine our consideration to the provisions of the Constitution itself.

The first sentence in the section quoted is clear, explicit and comprehensive. It states: ''No city or town shall issue *any* bonds or *other* interest-bearing *obligations* for *any purpose*, or in *any manner,* to an amount which, including existing indebtedness, shall at any time, exceed 18 per centum of the assessed valuation * * * .'' (Italics supplied.) The language is as comprehensive as human ingenuity could devise. The expression ''no city or town'' is sweeping. Not only the specific word ''bonds'' is used, but the generic term ''obligations''. This is followed by the phrases, ''for any purpose, or in any manner.'' It is stated in one of the briefs that these phrases are *''omnivorous.''*

In *Richmond & West Point Land, Navigation and Improvement Co.* v. *Town of West Point,* 94 Va. 668, 27 S. E. 460, it was held that, unless restrained by some statute, a municipal corporation had authority to purchase property necessary to the proper exercise of any power specifically conferred or essential to the purposes of municipal government, and, as an incident to that power, to give promissory notes and to execute and deliver interest-bearing obligations evidencing deferred payments of the purchase price. This case was followed in *Lynchburg & Rivermont Street Ry. Co.* v. *Dameron & Others,* 95 Va. 545, 28 S. E. 951.

The principle announced in these cases was evidently known to the members of the Constitutional Convention. However this may be, the language used in the first paragraph of section 127 clearly fixes a limit which the municipality may not exceed in purchasing property on the installment plan. Two other paragraphs were added, extending the authority of municipalities over their finances. The second paragraph, designated (a), deals

with annual revenues and is not involved in this litigation. The third paragraph, designated (b), defines the class or type of indebtedness to be excluded from consideration in determining the 18 per cent limitation stated in the first paragraph. It, in part, reads: ''Bonds authorized by an ordinance enacted in accordance with section One Hundred and Twenty-three, and approved by the affirmative vote of the majority of the qualified voters of the city or town voting upon the question of their issuance * * * for a supply of water or other spefic undertaking from which the city or town may derive a revenue * * * .''

It is to be noted that this form of indebtedness must be incurred for a *definite purpose,* and the ordinance authorizing the indebtedness must be adopted in a *specific manner.* The *purpose* of the bond issue must be ''for a supply of water or other specific undertaking from which the city or town may derive a revenue.'' The *manner* of creating the indebtedness must be by an ordinance enacted in accordance with another constitutional mandate and ''approved by the affirmative vote of the majority of the qualified voters of the city or town voting upon the question.''

So careful were the framers of the Constitution to preserve and protect the credit of municipalities that they were unwilling to leave the question of the success of the proposed venture to the exclusive judgment of the voters of the municipality, as the section provides that, if, after a certain period, not exceeding five years from the date of the election, the ''undertaking fails to produce sufficient revenue to pay for cost of operation and administration (including interest on bonds issued therefor), and the cost of insurance against loss by injury to persons or property, and an annual amount to be covered into a sinking fund sufficient to pay, at or before maturity, all bonds issued on account of said undertaking, all such bonds outstanding shall be included in determining the limitation of the power to incur indebt-

edness, unless the principal and interest thereof be made payable exclusively from the receipts of the undertaking.''

The essentials necessary to exclude bonds from consideration in determining the 18 per cent limitation are: (1) An ordinance adopted by the council in accordance with section 123 of the Constitution; (2) an affirmative vote of a majority of the qualified voters voting upon the question; (3) the project contemplated must be revenue-producing; (4) after five years from date of election the revenues from the project must pay operating expenses and provide a sinking fund sufficient to retire the bonds at or before maturity, or the principal and interest thereof must be made payable exclusively from the receipts of the undertaking.

This meaning or interpretation of the language used in the whole section gives full force and effect to each and every sentence, phrase and word in the order of rhetorical arrangement in which the framers have placed them. The result is that municipalities, with no restriction as to the course to be pursued, may incur indebtedness to an amount equal to 18 per cent of the assessed valuation of real estate subject to taxation. Municipalities may incur indebtedness in excess of this limitation for any public utility, provided the appropriate ordinance creating the indebtedness is approved by a majority of the qualified voters voting upon the question. This gives to the limitation set by the Constitution a broad latitude which only requires, for the extension of the limitation of the indebtedness, the approval of a majority of the citizens. In other words, the authority to determine whether such ventures are to be undertaken, where the amount of indebtedness exceeds the restriction, rests upon the considered judgment of the voters within the town who must ultimately pay the debt, either as taxpayers or as consumers of the water, electric energy, or whatever product is manufactured or produced by the undertaking.

Appellants contend that the revenue certificates impose no liability upon the inhabitants of the town as taxpayers, and, for this reason, the provisions of section 127 do not apply.

██ ██ This contention rests upon the theory of the "special fund doctrine" supported by numerous cases from other jurisdictions. Most of these cases are annotated in 72 A. L. R. 687 and 96 A. L. R. 1385. The conclusions in many of the decisions seem to be based on economic necessity rather than convincing legal reasoning. In each jurisdiction the court was compelled to construe the language of the Constitution or statute prescribing the limitations or restrictions in that particular state. The large majority of the decisions hold that indebtedness, payable solely out of income or revenue derived from the specific undertaking, should be excluded from the restrictions named. Counsel for different parties have, in their briefs, copied extracts of the pertinent constitutional or statutory provisions from the various states. It would serve no useful purpose to prolong this opinion by quoting the various provisions controlling the different courts in arriving at their conclusions and comparing them with the provisions now under consideration. While the decisions in other jurisdictions are entitled to consideration, they are not controlling, as this court is bound by the meaning of the language used in the Virginia Constitution.* In considering this language, it is to be remembered that the power of a municipality, unlike that of the state legislature, must be exercised pursuant to an express grant, and in the particular manner specified, if one is specified.

██ It was clearly the intention of the framers to affold municipalities protection against undue extravagance by their governing bodies and, at the same time,

*See extracts from Judge Leigh's opinion quoted in *Town of Galax et als.* v. *Appalachian Electric Power Co., et als., ante,* page 29, 12 S. E. (2d) 778, announced January 13, 1941.

give them power, with the approval of the electors, to exceed the limitations for the purpose of financing self-liquidating capital improvements.

█ The language used is plain and unambiguous. It conveys a clear and definite meaning, indicating the purpose intended. When this is the case, courts are not permitted to interpret that which needs no interpretation, and hence general rules for the construction of either constitutional or statutory provisions of doubtful meaning have no application.

█ In *Lake County* v. *Rollins*, 130 U. S. 662, 670, 9 S. Ct. 651, 652, 32 L. Ed. 1060, Mr. Justice Lamar states this principle and makes other comments applicable to the case now under consideration. Hence we quote extensively from this opinion:

"We are unable to adopt the constructive interpolations ingeniously offered by counsel for defendant in error. Why not assume that the framers of the constitution, and the people who voted it into existence, meant exactly what it says? At the first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain; and in such case there is a well-settled rule which we must observe. The object of construction, applied to a constitution, is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.

██ "To get at the thought or meaning expressed in a statute, a contract or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument,

then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it. *Newell* v. *People,* 7 N. Y. [9], 97; *Hills* v. *Chicago,* 60 Ill. 86; *Denn* v. *Reid,* 10 Pet. 524 [9 L. Ed. 519]; *Leonard* v. *Wiseman,* 31 Md. [201], 204; *People* v. *Potter,* 47 N. Y. 375; Cooley, Const. Lim. 57; 1 Story on Const., sec. 400; *Beardstown* v. *Virginia,* 76 Ill. 34. So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. *United States* v. *Fisher,* 2 Cranch 358, 399 [2 L. Ed. 304]; *Doggett* v. [*Florida*] *Railroad,* 99 U. S. 72 [25 L. Ed. 301].

"There is even stronger reason for adhering to this rule in the case of a constitution than in that of a statute, since the latter is passed by a deliberative body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination and fuller opportunity exists for attention and revision of such a character, while constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a State, the most of whom are little disposed, even if they were able, to engage in such refinements. The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption.

"Such considerations give weight to that line of remark of which *People* v. *Purdy,* 2 Hill [N. Y] [31], 35 [36], affords an example. There, Bronson, J., commenting upon the danger of departing from the import and meaning of the language used to express the intent, and hunting after probable meanings not clearly embraced in that language, says: 'In this way * * * the constitution is made to mean one thing by one man and something else by another, until in the end it is in danger

of being rendered a mere dead letter, and that, too, where the language is so plain and explicit that it is impossible to make it mean more than one thing, unless we lose sight of the instrument itself and roam at large in the boundless fields of speculation.'

"Words are the common signs that mankind make use of to declare their intention to one another; and when the words of a man express his meaning plainly, distinctly and perfectly, we have no occasion to have recourse to any other means of interpretation."

The framers of this constitutional section placed the authority on the electors of a municipality to determine whether the municipality, in acquiring an electric lighting system, should exceed the 18 per cent limitation. This is true whether it is contemplated that such indebtedness should be paid out of the general revenues of a municipality or out of the net revenues to be received from the operation of the system. Neither the general assembly nor the court has the power to deprive the electors of the opportunity to determine for themselves whether or not the venture should be undertaken.

The procedure required to take the sense of the electors on questions of this nature is comparatively simple. The time consumed in ascertaining their views need not exceed five weeks from the date an appropriate ordinance is passed by the council. See Code, sections 3082-3088.

Appellants maintain that this court, in refusing an appeal in *Virginia Public Service Co.* v. *Town of Blackstone*, has decided the question in accordance with their contention. The appeal was refused in September, 1927, without an opinion. Only one of the judges who participated in consideration of the petition is now on the bench. There were seventeen errors assigned in the petition. One of them raised the question now under consideration. The answer filed in behalf of Blackstone denied that the deferred purchase price of the electric light system increased the municipal indebtedness to the 18 per cent limitation. The trial court must have so

held, and this court may have determined that the evidence introduced by the Virginia Public Service Company on this issue was not sufficient to overcome the presumption in favor of the decision of the trial court. Whatever reasons impelled the court, as then constituted, to refuse the appeal, this case is not a controlling authority under the doctrine of *stare decisis*.

References are made in the briefs to a letter bearing date on the 28th day of March, 1940, from the Attorney General to the Governor, expressing his opinion on the validity of a bill passed by the General Assembly but, on that date, unsigned by the Governor. The letter discusses the power of the legislature under other sections of the Constitution, not the power of a municipality under section 127. Nothing said herein should be considered as an intimation of the views of the court on the questions discussed by the Attorney General, as none of them are before the court in this case.

 The decree of the trial court is

*Affirmed.*

SPRATLEY, J., dissenting.

I am unable to agree that the principles of law applied by the majority in the case of *Town of Galax, et als.* v. *Appalachian Electric Power Co., et als., ante,* page 29, 12 S. E. (2d) 778, this day decided, are necessarily applicable in this case. The facts in the two cases, as well as the controlling questions arising under Virginia Constitution, section 127, are essentially different.

In the *Galax Case* the parties agreed that the pivotal question was the necessity of an election for the valid issue and sale of municipal bonds in excess of eighteen per cent of the assessed valuation of the real estate subject to taxation by the town. The town contended that the bonds, inasmuch as they were revenue bonds,—that

is, bonds to be redeemed from the revenue derived from the operation of the property to be acquired,—came within the exemption of the concluding clause of sub-section (b) of section 127 of the Constitution and did not require the approval of the voters of the town before issue.

In this case the town contends that its contract imposes no indebtedness upon it and therefore creates no liability within the meaning of the limitations contained in either section 127 of the Constitution or sections 3079 to 3083, inclusive, of Virginia Code 1936.

In the *Galax Case*, the town council planned to construct and operate a municipal electric plant. This involved the expenditure of $287,000. Of this amount, $129,000 was given to the town by the Federal Government. The council proposed to raise the remaining $158,000 by the issue and sale of bonds of the town to a firm of underwriters. It was specified that these bonds were payable solely out of the earnings of the proposed plant and not out of the general funds of the town. The town was to hold title to the plant, and the bonds were to constitute a lien on the net revenue and the equipment of the plant.

I concur in the opinion expressed in the *Galax Case*, that the language of the constitutional clause, subsection (b), applies to the bonds in that case described, and that such bonds may be validly issued only after approval by the qualified voters of the town. These bonds represent money borrowed and create an indebtedness under the letter and spirit of the Constitution. The property of the town, built from the money borrowed, from money granted by the Federal Government and from its own funds, is pledged as security for their payment. They are proposed to constitute an indebtedness of the town for which its property can be taken in default of payment and, in this sense, they are a form of indebtedness, although limited to repayment from a specific asset.

The opinion of the trial judge in the *Galax Case*,

adopted by the majority, should be considered only in relation to the subject under discussion in that case. Trial Judge Leigh was dealing only with revenue bonds, —bonds payable exclusively from the receipts of the undertaking as defined in the constitutional provision. They related to an "undertaking" owned by the town.

The granting of funds by the Federal Government to relieve unemployment, and the construction of plants by manufacturers of equipment, to be paid for by towns out of plants to be wholly operated by towns, are economic inventions of the present generation. They were not contemplated by the framers of the Constitution, nor dreamt of in their philosophy. They are new plans and devices which mark the genius of the present age.

It is recognized that the intention of the framers of the Constitution was to protect the taxpayers from the extravagance, speculation and optimism of their governing bodies in the expenditure of municipal funds. The purpose of the constitutional provision was to establish a limit of indebtedness, beyond which the town could not go without the consent of its voters. It contains no purpose to deny to a municipality the right to acquire property without the assumption of any indebtedness.

In the instant case, the Chicago Pneumatic Tool Company submitted a proposal to the town of South Hill to furnish and install an electric plant of the value of $150,000. The property furnished was to be treated as personal property, and title was to remain in the Chicago Company until it had been paid for. The plant was to be constructed by the company and operated by the town. The town was given the right to acquire it by paying the costs of construction, principal and interest, solely from the net receipts derived from the operation of the plant, with no obligation against the general funds or other funds or property of the town. In further evidence of the agreement, the town was to execute "Pledge of Receipts Certificates," upon the face of which the terms and conditions of their issuance was expressly set out.

There was to be no lien created against any land of the town, and no burden placed on its taxpayers. The town borrowed no money from anyone. In the construction of the plant it did not use its own money, or money received as a gift.

The form of certificate provided for in the contract contains the following language:

"It is the essence of said contract and this certificate that no indebtedness or other obligation or duty on the part of the Town of South Hill shall be created or inferred hereby which may require payment from taxes or general funds or constitute an indebetdnes or general obligation of the Town of South Hill within the meaning of, or be in any wise in contravention of the Constitution or laws of the State of Virginia." Thus parties competent to lawfully contract for the construction and sale of a public utility enter into a contract of sale and purchase, wherein they expressly specify that, regardless of present and future conditions, no indebtedness or obligation of any character, constituting an indebtedness within the meaning of a constitutional limitation or in contravention thereof, shall be created against a contracting party.

As the peculiar language of our Constitution brings the obligations in the *Galax Case* within its limitations, so the peculiar language of the contract in this case leaves the engagement therein entered into without the limitations of the Constitution. The effect of a denial of the free right of the parties to so lawfully contract is to say that they do not know what they are doing, that they will not live up to the terms of their agreement, and that a liability will be placed on one of the parties in spite of their continued declarations that no such interpretation can be placed upon the agreement.

The governing body of the town is the sole judge of the wisdom, policy and expediency of acquiring and operating a public utility. This court ought not to interfere except in a case of the abuse of lawful power.

Call, if you please, the terms of the contract a plan or device to avoid the constitutional limitation of section 127. This it does in no uncertain terms. It is worded in clear, plain, precise and simple language. It was entered into for a valuable consideration between capable parties with knowledge of all its terms and conditions. It is an honest contract, not suggestive of fraud in the slightest degree. Its language needs judicial construction no more than the language of the section of the Constitution under review. It speaks for itself. There is no justification for any court to give to it any meaning other than the meaning plainly contained in the words of the parties themselves.

The contract does not contravene the letter or spirit of section 127, nor the intention of the framers of the Constitution to prevent over-expenditure of the funds of the town. The town loses nothing if the venture is a failure, and consequently cannot be held liable for an unjust enrichment, for, in such event, it gains nothing. If it is a success, the town acquires ownership and title to the property, the builder of the plant secures its money, and both parties are satisfied. If the owner of the property chooses to take this risk, it is not for the court to deny it that right. The indebtedness, if any, is the indebtedness of the plant and not an indebtedness of the town.

In point of facts and the law involved, this case is on all fours with the case of *Virginia Public Service Company, et als.* v. *Town of Blackstone, et als.*, where a similar contract was held, by the Circuit Court of the county of Nottoway on July 1, 1927, not to contravene the Constitution. An appeal was refused by this court in September of the same year, thus in effect affirming the lower court.

On the related question,—whether so-called "revenue bonds," payable exclusively out of the revenues of the project for the financing of which such obligations are incurred, come within the inhibitions of the constitu-

tional limitation on public indebtedness—the courts of last resort in this country are in almost unanimous agreement that the constitutional provisions are not applicable, *Wyatt* v. *State Roads Commission,* 175 Md. 258, 1 A. (2d) 619; *Estes* v. *State Highway Commission,* 235 Ky. 86, 29 S. W. (2d) 583; *Bates* v. *State Bridge Commission,* 109 W. Va. 186, 153 S. E. 305; and *Bennett* v. *Spencer County Bridge Commission,* 213 Ind. 520, 13 N. E. (2d) 547. The holding is based upon the fact that there is no cost to add to the burden of the taxpayers, present or future, nothing to be paid out of taxes, and no charge incurred for which taxes could be levied. In cases from the courts of last resort in more than thirty States, only two have held to the contrary (*Miller* v. *City of Buhl,* 48 Idaho 668, 284 P. 843, 72 A. L. R. 682; *Zachary* v. *City of Wagoner,* 146 Okl. 268, 292 P. 345), and one of these courts subsequently reversed itself (*Baker* v. *Carter,* 165 Okl. 116, 25 P. (2d) 747). See 72 A. L. R. 687, 96 A. L. R. 1385 and 100 A. L. R. 900.

While the language of the Virginia Constitution, in our opinion, takes such bonds as are described in the *Galax Case* out of the application of the rule controlling the decisions in the great majority of the jurisdictions, it surely cannot be logically held that its language prevents a town from entering into a contract to acquire property which it may lawfully possess where no debt or obligation against the town or its taxpayers is incurred. I am unwilling to agree that the Virginia Constitution denies the town of South Hill the right to enter into a contract with the full and free consent of all parties where there is no obligation or liability in the nature of a debt imposed upon the town.

Briefly summarizing the contrasting situations in the *Galax Case* and in the instant case, we find that:

In the first-named case the town borrows money and issues bonds, interest-bearing obligations, in evidence thereof. The borrowed money is employed to pay, in part, the cost of constructing a public utility plant for

the town. The net revenue from the operation of the plant and the physical properties of the plant are pledged as sole security for the payment of the bonds. The obligation assumed by the town constitutes an indebtedness for the purpose and to the extent specified. Under the Constitution, any such indebtedness, in excess of the eighteen per cent limit prescribed therein, must be approved by the electorate of the town.

In the instant case, no money is borrowed. No money of the town is used in the construction of the plant. The certificates issued under the contract are to be paid solely from the net revenue derived from the operation of the plant of the Chicago Pneumatic Tool Company. By their express terms they create no indebtedness against the town. The town cannot be overburdened with that which it is under no obligation to discharge, nor become bankrupt by what it does not have to pay. Something that is not an indebtedness cannot be added to an indebtedness.

In view of the status of this case, it would be futile to undertake here to discuss the several other questions raised in the record.

HOLT, J., concurs in this dissent.