# Richmond

J. Lindsay Almond, Jr., etc. v. Henry G. Gilmer, etc.

January 10, 1949.

Record No. 3463.

Present, All the Justices.

*J. Lindsay Almond, Jr., Attorney General,* and *C. Champion Bowles, Assistant Attorney General,* for the petitioner.

*Irby Turnbull, Guy B. Hazelgrove* and *Ralph T. Catterall,* for the respondent.

MILLER, J., delivered the opinion of the court.

This proceeding is to determine the constitutionality of an act of the General Assembly approved April 1, 1940, (Acts 1940, Chap. 399, p. 711) known as the "State Revenue Bond Act", and the validity of bonds authorized to be issued thereunder.

The State Highway Commission which will be hereinafter called the Commission, is thereby authorized and empowered to acquire by purchase or by condemnation, and to construct, improve, operate and maintain any one or more of the following projects, or properties:

A. York River Bridge, extending from the town of Yorktown, or some point in York county, across the York River to Gloucester Point, or some point in Gloucester county;

B. Rappahannock River Bridge, extending from Greys Point, or vicinity, in Middlesex county, across the Rappahannock River to the vicinity of White Stone, in Lancaster county;

C. Claremont Ferry, operating from Charles City county, Route 617, across the James River to Claremont, in Surry county, to Route 40;

D. James River Bridge, from the city of Hopewell across James River to Charles City county;

E. James River Bridge, from Jamestown, James City county, across James River to or near Scotland Wharf, in Surry county;

F. The Kings Highway, including the Nansemond River Bridge, in Nansemond county, between Route 192, near Chuckatuck, and Route 627 at Driver Station;

G.  Old Point Ferry, operating from Old Point, Elizabeth City county, across Hampton Roads to Willoughby, in the city of Norfolk;

H.  James River, Chuckatuck and Nansemond River Bridges, with necessary connecting roads, in Warwick, Isle of Wight and Nansemond counties;

I.  Newport News Ferry, operating across Hampton Roads, from Newport News to Pine Beach, in Norfolk.

The authorization to acquire, construct and operate includes all approaches, property, easements and franchises convenient to the use and maintenance of the projects.

The Act consists of sections 1-24, both inclusive.  They set forth .in detail the means and manner by which the several properties and projects may be acquired and constructed, and how the cost of acquisition and construction may be financed by issuance and sale of bonds, to be solely paid from the tolls to be derived from the operation of such enterprises.

In its discretion, the Commission is allowed to unite in one unit for financing any two or more of the projects or properties.

To provide the necessary funds for the acquisition and construction, sections 2 (b) and (c) of the Act empower the Commission "To issue revenue bonds of this State, to be known and designated as 'State of Virginia Toll Revenue Bonds,' payable solely from earnings, to pay the cost of such projects; and to fix and collect tolls and other charges for the use of such projects."

The cost, which includes all expenses of acquisition or construction, shall be paid solely from proceeds received for the bonds or from any grant or contribution which may be made pursuant to the Act.

That the issuance and sale of bonds may not be violative of the terms of sections 184-a and 184-b of the State Constitution, section 3 of the Act expressly states:

"Revenue bonds issued under the provisions of this act shall not be deemed to constitute a debt of the State of Virginia or a pledge of the faith and credit of the State,

but such bonds shall be payable solely from the funds herein provided therefor from tolls and revenues. All such bonds shall state on their face that the State of Virginia is not obligated to pay the same or the interest thereon except from the special fund provided therefor from tolls and revenues under this act, and that the faith and credit of the State are not pledged to the payment of the principal and interest of such bonds. The issuance of revenue bonds under the provisions of this act shall not directly or indirectly or contingently obligate the State to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment, other than to appropriate available funds derived as revenues from tolls and charges collected under this act."

Under sections 7 and 8, title to all property acquired shall be taken in the name of the State and may not be encumbered or pledged to pay the cost of acquisition, construction, operation or maintenance. It shall be paid for, but only with the funds provided for under the Act.

Section 10 empowers the Commission by resolution to issue revenue bonds bearing interest not exceeding five per cent to pay the cost of acquisition and construction. The proceeds of the bonds may be used only to pay the cost of the project or projects for which issued. "The principal and interest of such bonds shall be payable solely from the special fund herein provided for such payment."

Section 11 requires that tolls and revenues received and all proceeds secured by sale of bonds or by grant or appropriation be held as trust funds to complete the acquisition, construction and maintenance of the projects, and all tolls and revenues thereafter received are to be used in payment of the principal and interest of said bonds. All funds received from sale of bonds or as tolls and revenues shall be paid into the State Treasury and carried on the books of the Comptroller in a special account. In the resolution, or by trust indenture mentioned below, it may be provided that all money paid into the State Treasury pursuant to this Act shall be appropriated for the purpose of carrying out these provisions.

The Commission is empowered by section 12 to execute a trust indenture pledging revenues and tolls received to the end that the same be held and applied solely as provided for in the Act, but no project or part thereof may be conveyed or mortgaged. The trust indenture "may contain such provisions for protecting and enforcing the rights and remedies of the bondholders as may be reasonable and proper and not in violation of law, including covenants, setting forth the duties of the commission in relation to the acquisition, construction, improvement, maintenance, operation, repair and insurance of the projects * * *."

Under section 13, the Commission shall collect tolls for the use of the projects and shall from time to time fix and revise the schedule thereof. The proceeds so obtained, which are to be deposited in the special fund shall be used to pay the cost of operating, maintaining, and repairing the projects "unless such cost shall be otherwise provided for * * *." But there is no mandatory requirement that such cost shall be provided from any other source.

Though section 14 authorizes the Commission in its discretion to use "funds available for the construction of State highways, in any construction district in which any project is wholly or partially located, to aid in the payment of the cost of such projects and for the payment, purchase or redemption of revenue bonds issued in connection with any such project" or projects, yet there is no requirement that this shall be done.

Section 16 sets forth the rights and remedies of the bondholders. They may, by appropriate legal proceedings, enforce any rights under the laws of the United States or the State of Virginia or given by the Act, resolution or trust indenture, "including the fixing, charging and collection of tolls for the use of such project or projects."

Some months prior to May 25, 1948, the Commission instituted condemnation proceedings against the owner of the Old Point Ferry and the Newport News Ferry (Chesapeake Ferries), which are herein designated as projects G and I, respectively. The purpose was to acquire such

properties as a part of the State highway system. The final award of compensation and damages therefor amounted to $2,692,976.98. That sum was, by order of court, required to be paid on or before May 25, 1948.

Before payment of the award, the Commission decided to acquire the bridge properties owned by the James River Bridge System, commonly called the James River Bridges, projects F and H, herein, and to construct the bridges across the York and Rappahannock Rivers, comprising projects A and B herein.

It now desires to unite these several projects into a single unit for financing and issue from time to time revenue bonds to pay the cost of acquisition and construction. All bonds, when finally issued, are to constitute bonds of a single issue. But as it was necessary that payment of $2,692,-976.98, awarded for the Chesapeake Ferries, be made by May 25, 1948, the Commission, as it was empowered to do by section 14 of the Act, used available funds for the construction of State highways in the construction district or districts in which the Chesapeake Ferries were located to pay the award. This was authorized by resolution of May 24, 1948. It directed that the Commission advance and pay that sum and provide for issuance of a "State of Virginia Toll Revenue Bond" for $2,700,000, payable in nine yearly installments of $200,000 each, beginning on the first day of May, 1949, and three yearly installments of $300,000 each, beginning on the first day of May, 1958, bearing interest at three *per centum per annum* on the yearly unpaid balance.

The trustees of the Virginia Retirement System have agreed to purchase that bond. Upon receipt of $2,700,000, the face amount of the bond, the Commission will reimburse itself for the sum so advanced in payment of the award for the ferries. Upon completion of the united projects, that bond or any unpaid portion will be retired, and any new bonds issued will be paid from the bridge and ferry tolls to be charged and obtained for use of the same by the public.

All funds in the Treasury, carried in the special account, can be disbursed only by the State Treasurer upon warrants of the State Comptroller. The Comptroller entertained doubt of the constitutionality of the Act and expressed his unwillingness to make any payments on account of any interest or principal of such bond, agreed to be acquired by the Virginia Retirement System, until the constitutionality of the Act be determined. He so advised the Attorney General of Virginia by letter of June 11, 1948.

Mandamus proceeding to test the constitutionality of the Act and the validity of the bond or bonds contemplated to be issued was instituted by the Attorney General against the Comptroller.

This procedure is provided for by Acts, 1944, p. 425. See *Almond* v. *Gilmer*, *ante*, p. 1, 49 S. E. (2d) 431.

All acts of the legislature are presumed to be constitutional until the contrary be clearly shown. If through reasonable interpretation and construction it can be concluded that the Act contravenes no provision of the Constitution, it is the duty of this court to pronounce it valid. If there be reasonable doubt whether it violates the fundamental law, that must be resolved in favor of the Act. Only where it is plainly in violation of the Constitution may the court so decide. *Whitlock* v. *Hawkins*, 105 Va. 242, 53 S. E. 401; *Roanoke* v. *Elliott*, 123 Va. 393, 96 S. E. 819, and Vol. 2, Va., W. Va. Digest, "Constitutional Law", p. 725. The scope of the presumption in favor of its validity is tersely but sufficiently stated in *Hunton* v. *Commonwealth*, 166 Va. 229, 183 S. E. 873:

"Every reasonable doubt should be resolved in favor of the constitutionality of an act of the legislature." (166 Va. at p. 236.)

Cases elaborating upon this canon of construction are collected in the opinion by Mr. Justice Eggleston in *Roanoke* v. *Michael's Bakery Corp.*, 180 Va. 132, 21 S. E. (2d) 788.

The petitioner insists that none of the provisions of the State Revenue Bond Act is violative of the Constitution; nor are the ownership and operation of ferries by the State

prohibited. He maintains that acquisition, construction, maintenance and operation of toll bridges and ferries by the State are not violative of section 185 of the Constitution, and are fully authorized by this and other acts of the General Assembly. He likewise maintains that issuance of the bonds contemplated by the Act is not violative of section 184-a or 184-b of the Constitution.

On the other hand, respondent insists that the acquisition and operation by the Commission of the ferries and the issuance of the Toll Revenue Bonds are violative of these three sections of the Constitution in the particulars hereinafter recited.

The pertinent provisions of the sections will be set forth.

As section 184 is referred to in sections 184-a and 184-b it will be quoted.

Section 184. "The General Assembly may contract debts to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion, or defend the State in time of war."

Section 184-a. "No debt or liability, except the debts specified in section one hundred and eighty-four, shall be hereafter contracted by or in behalf of the State, unless such debt shall be authorized by law for some single purpose * * *. No such law shall take effect until it shall have been submitted to the people at a general election, * * *."

Section 184-b. "No scrip, certificates, or other evidence of indebtedness, shall be issued, except for the transfer or redemption of stock previously issued, or for such debts as are expressly authorized in this Constitution."

Section 185. "* * * nor shall the State become a party to or become interested in any work of internal improvement except public roads * * *."

The questions presented are:

1. Does this Act allow a debt or liability to be contracted by or on behalf of the State in contravention of the terms of section 184-a which requires such laws to be first submitted to a vote of the people?

2. Does a bond issued under the Act constitute "evidence of indebtedness" prohibited in section 184-b?

3. Does section 185, by necessary implication, prohibit the acquisition and operation of ferries by the State?

As the alleged violation of section 185 goes only to that part of the Act which contemplates the acquisition and operation of ferries, it will be first considered.

The construction, maintenance and operation of a highway system is a governmental function. Unless abridged by the Constitution, that inherent power exists in the State by virtue of its sovereignty.

In 40 C. J. S., under the title of "Highways", sec. 177, p. 25, it is stated thus:

"The construction, maintenance, and repair of pubilc highways is a governmental function, which belongs primarily to, and may be exercised by, the state and state legislature. The power of the state to exercise this function is inherent, plenary, and part of its police powers * * *."

The Constitution of 1869 which was in effect until the adoption of the Constitution of 1902 forbade the State to become interested in any work of internal improvement. Section 15 of Article 10 thereof reads:

"The state shall not be a party to, or become interested in, any work of internal improvement, nor engage in carrying on any such work, otherwise than in the expenditure of grants to the state of land or other property."

It is insisted by respondent that roads, toll bridges and ferries constitute works of internal improvement, and though the State Government is now by section 185 of the Constitution authorized and empowered to construct and maintain public roads, this, they say, does not include ownership and operation of ferries.

Whether public roads, toll bridges and ferries constitute works of internal improvement need not be decided if the right to construct and operate public roads also gives the right and power to maintain bridges and ferries as a part thereof.

Respondent concedes that the right to construct and main-

tain public roads carries with it the authority to acquire, construct and maintain bridges.

▪ The Constitution of 1902 was adopted as a whole. In declaring, in section 185, that the State is not prohibited from becoming interested in public roads, it not merely restores full control of that governmental power to the legislature, but its effect is to allow full exercise of that function as if it had never been abridged by the Constitution of 1869.

Do the words "public roads", as used in the context, include ferries which consist of connecting links in a public highway? Are the words to be given a broad and comprehensive meaning, or is the gevernmental power recognized as abiding in the legislature to be restricted because the word "ferry" was not expressly· used?

It is made evident by events subsequent to adoption of the Constitution of 1902 that both legislative and administrative officers of this Commonwealth construed the language of section 185 as empowering the State to acquire and operate toll bridges and ferries. By enactments of 1906 and 1918, the General Assembly provided for the establishment of a comprehensive system of highways. Acts 1906, Chap. 73, p. 71, and Acts 1918, Chap. 10, p. 9. Acts 1928, Chap. 273, p. 779, appearing as section 2072(2) of the Code of Virginia, 1942 (Michie), expressly authorized and empowered the State to acquire toll bridges. We likewise find that in 1924, Acts 1924, Chap. 453, p. 680, section 1975q, Code of Virginia, 1942 (Michie), the Commission was given the authority to acquire "any ferry within the State of Virginia which forms a connecting link in a State highway whenever the said commission shall determine said acquisition to be advisable and expedient."

By Acts, 1924, Chap. 449, p. 676, section 1975r of the Code, 1942 (Michie), it is empowered to fix the rates of ferriage for the use thereof.

In defining public highway, section 1969j (1) of the Code of Virginia, 1942 (Michie) says:

"For the purpose of this act 'Public Highway' means highway, road and street; and where applicable, the term

'Public Highway' also includes bridge, ferry, causeway, landing and wharf."

In our opinion, this question has been put at rest by the decision in *State Highway Com'r v. Yorktown Ice, etc., Corp.*, 152 Va. 559, 147 S. E. 239, where it is said:

"It is practically conceded that a public ferry is a public highway. The authorities so hold. 11 R. C. L., page 913.

"In 25 C. J., page 1049, the law is stated thus: 'Ferries are frequently referred to or regarded as public highways, being continuations of the highways with which they connect, and serving the purpose of a bridge when a bridge is impracticable.' (152 Va. at p. 568.)

\* \* \* \* \* \*

"Mr. Cooley, in his 'Constitutional Limitations,' discussing the right of the State to establish ferries over navigable streams, said: 'This is only the establishment of a public highway.'" (152 Va. at p. 569.)

We conclude that the word "road" appearing in section 185 of the Constitution is generic. To say that ferries, as well as bridges, are connecting parts or stretches of public roads is not attributing to the words unnatural or unusual meaning, but merely such as is universally recognized and accepted when used in a like context to section 185 which merely leaves the General Assembly free to exercise the State's governmental powers and duties suited to the welfare of the public.

To those inclined to strict interpretation, the words of Justice Holmes in *Bain Peanut Co. v. Pinson*, 282 U. S. 499, at p. 501, 51 S. Ct. 228, 75 L. Ed. 482, may be enlightening and persuasive:

"We must remember that the machinery of government would not work if it were not allowed a little play in its joints."

It is admitted by respondent that the *bonds* proposed to be issued, which are solely payable out of funds derived from operation of the proposed projects, are not debts "contracted by or in behalf of the State." With that we agree. Yet it is insisted that the duties that may be assumed by the

Commission under sections 11 to 14, both inclusive, and section 16 of the Act, and accepted in its resolution of May 24, 1948, under which the issuance of the $2,700,000 bond was accomplished impose contractual obligations upon the State which are liabilities "contracted by or in behalf of the State * * *."

It is axiomatic that the Commission cannot obligate itself or the State on the bond, or in the covenants set forth in its resolution, except as the same conform to and are in pursuance of the terms of the Act. The obligations, if any, assumed cannot exceed the authority given in the Act. We therefore need look no further than its terms to ascertain whether it allows "liability" as used in the Constitution to be imposed upon the State.

Respondent maintains that the provisions of the last above-mentioned sections, which are to the effect that the tolls are converted into trust funds that may be pledged by a trust indenture to be used to maintain, repair and operate the enterprise and which instrument may also provide for protecting the rights of the bondholders not in violation of law and enforcement thereof by appropriate proceedings, when considered along with the power of the Commission to use available funds not otherwise allocated to acquire, construct or maintain such enterprise, in effect, require the State to keep the projects running even if the tolls be insufficient.

From that premise it is argued that the Act does authorize and empower the Commission to impose liabilities upon the State for which its tax funds and other revenues under the control of the Commission are made liable.

Considered alone, the context of the sections might be susceptible of that construction and interpretation,—that is, that they empower and allow the Commission to enter into contractual relations with the bondholders that may eventually impose liabilities upon the State that it could be called on in the future to meet. To sustain this position, it is insisted that the word "liability" used in the Constitution

is not synonymous with "debt" but is broader and more comprehensive.

Whether or not the words "debt" and "liability" are synonymous as used in section 184-a and therefore "liability" means nothing more than a debt, i. e., an obligation to pay a sum certain, it is not necessary to determine, for as we view the provisions of the Act as a whole, we are led to the conclusion that it imposes no debts or liabilities upon the State, even though the word "liability" be not construed as synonymous with "debt" but given a broader and more comprehensive meaning.

Unquestionably, the underlying purpose of the Act is to permit the State to acquire valuable properties and operate the same without incurring obligations to those furnishing the money,—i. e., the bondholders,—other than that the cost and expense of acquisition, maintenance and operation be paid from the purchase price of the bonds and the revenue received from the traveling public. That is expressly stated in section 3 wherein it is provided that no indirect or contingent obligation is imposed upon the State to levy any tax or make any appropriation toward the enterprise.

We also find in section 13 that the "tolls shall be so fixed and adjusted * * * as to provide a fund sufficient with other revenues of such project or projects, if any, to pay (a) the cost of maintaining, repairing and operating such project or projects unless such cost shall be otherwise provided for, and (b) such bonds and the interest thereon as the same shall become due." This necessarily means that funds derived from the tolls shall be first charged with the cost of maintenance, repair and operation, unless those items of cost be otherwise obtained, and after such provision is made, the funds so received from the tolls shall be used for the payment of interest and principal of the bonds.

It contemplates that the Commission may allocate funds for the maintenance, repair and operation not otherwise allocated or the State legislature, in its discretion, may make an appropriation for that purpose. Yet unless and until

other funds be so voluntarily made available, the receipts are charged with the cost of maintenance, repair and operation, and the right of the holders of the bonds to be paid interest and principal is therefore subordinate thereto and the State is not even indirectly or contingently obligated to make appropriation for their payment.

It is true that the Commission and the State of Virginia may stand by as benevolent protectors of this enterprise of their creation. The one may allocate any funds not otherwise allocated or prohibited, to aid in its acquisition, maintenance and operation, and the other may make such appropriations toward those ends as it may desire. Yet neither is required to assume such philanthropic role.

Not only is the construction, that the Act imposes no debt or liability upon the State, fully justified by its fundamental purpose and expressed provisions, but the *bond itself* recites that "the issuance of this bond shall not directly or indirectly or contingently obligate the State to levy or to pledge any form of taxation whatever therefor or to make any appropriation for its payment."

It further recites that it is issued pursuant to the resolution of the Commission of May 24, 1948, which, among other things, provides, "Nothing in the bond or in this Resolution shall be construed as pledging the faith and credit of the State or as creating any debt or liability of the State."

In the Constitution of 1902, as then adopted, section 184 consisted of two sentences. The second sentence began, "No scrip, certificate or other evidence of *State* indebtedness shall be issued * * *." (Emphasis supplied.)

Upon revision in 1928, the second sentence was made into section 184-b, but the word "State" which had theretofore appeared immediately before the word "indebtedness" was omitted.

It is insisted that the section as it now appears forbids the issuance of any "evidence of indebtedness" whether the State be obligated thereon or not. Specifically, it is said that the bonds, which are not intended to be obligations of the State but payable solely from segregated revenues earned

by the projects, are forbidden by this section because they are evidence of indebtedness payable by some one and therefore prohibited by the terms of the Constitution.

Why the word "State" was omitted in the revision of 1928 is not evident. It is, however, to be observed that it appears in the caption which reads: "Issues of evidence of indebtedness by State prohibited with certain exceptions."

We think it is thereby made apparent that the purpose of the section is that monetary obligations of the *State* imposing an indebtedness upon it payable from its current revenue were intended to be guarded against and forbidden.

We construe section 184-b as forbidding the issuance of scrip, certificates or other evidence of *State* indebtedness.

The measure and extent of the rights of the holders of these bonds issued solely under and by virtue of the terms of the Act are necessarily found within its structure and not elsewhere. They may look only to the special fund earned by the enterprise for payment. That is fully understood and agreed. The covenants and agreements included in and forming a part of each bond so state. The source and only source from which the holders may force payment is fixed, designated and limited. It is that special fund created by those who pay the tolls and charges for the use of the facilities made available and none other.

The validity of these bonds is therefore dependent upon the application of what is commonly designated the "Special Fund Doctrine." That principle has been adopted by a vast majority of the States and is set forth with clarity in 59 C. J., "States", sec. 370, p. 225:

"Obligations, issued by a state, if payable only from the revenue to be realized from a particular utility or property, acquired with the proceeds of the obligations, if payable only from the revenue to be realized from special taxes for a particular utility or property, acquired by the obligations or proceeds, or if payable only from a special fund to be raised from the sale or lease of lands previously set apart for the purpose of the obligations, do not generally constitute

debts of the state within the meaning of constitutional limitations on indebtedness; but constitutional limitations have been held to apply to obligations incurred for a particular utility or property, although payable from a special fnud derived from such property *owned by the state at the time of the creation of the indebtedness* and the revenue of which might be applied to the discharge of the general obligations of the state, or where the special fund is to be replenished by general taxation. However, it has been held that if such resort to general taxation is merely contingent no debt within the limitation of the constitution has been created. * * *" (Emphasis supplied.)

The decisions supporting the validity of the doctrine are collected and annotated in 72 A. L. R. 687, (1930), 96 A. L. R. 1385, (1934), and 146 A. L. R. 328, (1941).

In the resume of the annotations found at page 701 of 72 A. L. R., it is said:

"* * * the great weight of authority supports the view that the purchase of property does not give rise to an indebtedness or liability within the meaning of a constitutional or statutory debt limitation, where the purchase price is payable exclusively from income or profits to be derived from the property purchased."

Typical of the decisions adhering to this view are: *Bates* v. *State Bridge Comm.*, 109 W. Va. 186, 153 S. E. 305; *California Toll Bridge Authority* v. *Wentworth*, 212 Cal. 298, 298 P. 485; *Bloxton* v. *State Highway Comm.*, 225 Ky. 324, 8 S. W. (2d) 392; *Wyatt* v. *Beall*, 175 Md. 258, 1 A. (2d) 619, and *Attorney General* v. *State Bridge Comm.*, 277 Mich. 373, 269 N. W. 388, 270 N. W. 308.

With well-nigh complete uniformity the decisions approving the doctrine also hold that an undertaking to maintain rates sufficient to defray and liquidate the purchase price of the enterprise payable solely from the income does not give rise to an indebtedness within the purview of the limitations. 146 A. L. R. 341.

Upon the subject instructive articles are found in 47 Harvard Law Review, p. 688, 84 University of Pennsylvania

Law Review, p. 555, and 4 Fordham Law Review, p. 23.

In discussing "Revenue Bonds," the author of the Fordham article says at p. 27:

"The decisions rendered by the courts in passing upon the validity of revenue bond legislation have given rise to the so-called 'Special Fund Doctrine.' The questions usually presented in these cases are whether revenue bonds constitute an indebtedness within the meaning of a constitutional limitation on the amount of the indebtedness which may be incurred, or whether constitutional provisions requiring a bond issue to be approved at an election, or making mandatory the levy of a tax to pay interest and principal on bonds, apply. The Special Fund Doctrine affirms that obligations payable solely from a special fund derived from the revenue of the enterprise for which such obligations are issued do not constitute a bond or a debt within the meaning of any such constitutional limitation or provision."

In that article, the acts of the General Assembly of Virginia, Acts 1933, Chap. 26, p. 49, and Chap. 49, p. 83, are cited. It is not amiss to here observe that the legislature of Virginia, by the latter of those acts, authorized various state institutions to issue revenue bonds for financing and constructing projects under the Federal Public Works Administration. Under sections 184-a and 184-b of the Constitution, it could not legally authorize these institutions to incur debts or liabilities if prohibited by such constitutional mandates since the institutions are State agencies against which claims and judgments upon obligations of that character are in legal effect against the State. *Commonwealth* v. *Chilton Malt & Co.*, 154 Va. 28, 152 S. E. 336. However, under the authority of that Act, they have issued and disposed of bonds aggregating millions of dollars which have been accepted by private and public investors, including the Reconstruction Finance Corporation, and their validity has not been questioned or assailed.

We here find both legislative and administrative construction since 1933 of those two constitutional provisions

to the effect that they do not prohibit the issuance by the State of revenue bonds of the character under consideration. That construction is entitled to great weight. *Hunton* v. *Commonwealth, supra,* and *Commonwealth* v. *Stringfellow,* 173 Va. 284, 4 S. E. (2d) 357.

Nevertheless the respondent says that the special fund theory has been rejected by the decisions of this court in *Galax* v. *Appalachian Elec. Power Co.,* 177 Va. 29, 12 S. E. (2d) 778, and *South Hill* v. *Allen,* 177 Va. 154, 12 S. E. (2d) 770, and that under the doctrine of *stare decisis,* this act must be declared unconstitutional and the contemplated bonds void.

We do not attribute to those decisions such broad and comprehensive import.

In the two cases there was some distinction between the character of the obligations to be issued or undertaken, but in each instance the validity of the instruments in question was directly and solely dependent upon the construction given to section 127 of the Constitution which applies only to cities and towns.

Though it is a restriction upon the otherwise plenary power of the legislature to delegate to cities and towns the full authority to issue unlimited bonded or other intertest bearing indebtedness, it also operates *proprio vigore* and permits the incurring of such obligations by municipalities, but only to the extent and in the manner expressly stated therein. It is both a grant and a limitation of power.

In the *Galax Case* the court states that, "The decisive question presented is whether the 'revenue bonds', proposed to be issued under the seal of the town and paid out of revenues to be collected from the sale of electrical energy to the town and its inhabitants, are bonds or obligations within the purview of section 127 of the Virginia Constitution." (177 Va. 31.)

In the *South Hill Case* the court said: "Appellants contend than inasmuch as it is contemplated that the proposed purchase price of the plant should be paid from the net revenues received from operation, the certificates of in-

debtedness are not bonds or obligations of the town within the purview of the Constitution.

"This contention requires careful study and analysis of the following constitutional mandate (section 127)." (177 Va. 159.)

In that opinion, comment is made upon the fundamental difference in the power of a municipality as contrasted with that of the State. It is there said:

"In considering this language, it is to be remembered that the power of a municipality, unlike that of the state legislature, must be exercised pursuant to an express grant, and in the particular manner specified, if one is specified." (177 Va. 163.)

We find this material difference stated in *Danville* v. *Shelton*, 76 Va. 325, at p. 327:

"We said in *Ould & Carrington* v. *Richmond*, 23 Gratt. (64 Va.) 464, 467, 14 Am. Rep. 139, that public corporations 'have no inherent jurisdiction, like the State, to make laws or adopt regulations of government. They are governments of enumerated powers, acting by a delegated authority; so that, while the State legislature may exercise such powers of government, within the description of legislative power, as are not expressly or impliedly prohibited, the local authorities can exercise those only which are expressly or impliedly conferred, and such as are incidental, subject to such regulations as are annexed to the grant.'"

As heretofore said, any fair and reasonable doubt as to the constitutionality of this Act must be resolved in favor of its validity. Yet, any similar doubt entertained relative to the power of the municipalities to incur the obligations undertaken in the *Galax* and *South Hill Cases* had to be resolved against such right. *Winchester* v. *Redmond*, 93 Va. 711, 25 S. E. 1001, 57 Am. St. Rep. 822; *Donable* v. *Harrisonburg*, 104 Va. 533, 52 S. E. 174, 113 Am. St. Rep. 1056, 2 L. R. A. (N. S.) 910; *Board of Sup'rs* v. *Richmond*, 162 Va. 14, 25, 173 S. E. 356.

This enterprise, the fruits of which will inure to the public without any legal obligation to expend public

funds therefor, in no wise constitutes an evasion of the spirit or letter of the Constitution as asserted by respondent.

Therefore we conclude that the State Revenue Bond Act is not violative of the Constitution and that the contemplated action of the Commission in pursuance thereof, as disclosed by this record, is permitted.

The mandamus prayed for is awarded.

*Mandamus awarded.*