PRESENT: Kinser, C.J., Lemons, Millette, McClanahan, and Powell, JJ., and Russell and Lacy, S.JJ.

MONTGOMERY COUNTY, ET AL.

OPINION BY
v.  Record No. 100350        JUSTICE ELIZABETH A. McCLANAHAN
November 4, 2011
VIRGINIA DEPARTMENT OF RAIL AND
PUBLIC TRANSPORTATION, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

The Virginia Department of Rail and Public Transportation (DRPT) entered into an agreement, pursuant to the Rail Enhancement Fund created by Code § 33.1-221.1:1.1, to grant funds to Norfolk Southern Railway Company (Norfolk Southern) for the development of an "intermodal" terminal in Montgomery County.  The terminal would serve as a transition point for shifting the transportation of freight by road to shipment by rail, and vice versa.

Opposing the agreement between DRPT and Norfolk Southern, appellants, Montgomery County and the Board of Supervisors for Montgomery County (collectively, the County), instituted the instant action against DRPT, DRPT's Director, and the Commonwealth Transportation Board (CTB).  Norfolk Southern subsequently intervened as a defendant.  In its complaint, the County claimed that Code § 33.1-221.1:1.1 and the agreement were unconstitutional under Article X, Section 10 of the Constitution of Virginia, and sought to enjoin their administration.

Specifically, the County asserted that the statute and the agreement violated the prohibitions set forth in two of the clauses in Article X, Section 10, commonly referred to as the "internal improvements clause" and the "credit clause." Under the internal improvements clause, the Commonwealth is prohibited from certain involvement in "any work of internal improvement" with the express exception of public roads and public parks. Va. Const. art. X, § 10. Under the credit clause, the Commonwealth is prohibited from lending its credit to any person, association or corporation. Id.

The parties submitted documentary evidence to the circuit court, and based upon those submissions filed cross-motions for summary judgment on the County's constitutional challenge. Ruling in favor of the three government defendants and Norfolk Southern (the appellees in this appeal), the circuit court concluded in its letter opinion that the agreement between DRPT and Norfolk Southern had been "properly effectuated pursuant to constitutionally valid legislation of the Virginia General Assembly animating public purposes, [and] governmental ones, aimed at providing for the common welfare of its citizenry to improve efficiencies of public roads."

On appeal, the County challenges the constitutionality of Code § 33.1-221.1:1.1, as applied, in authorizing funding to Norfolk Southern for the facility's development under the terms

2

of the agreement.  The issue we decide is whether this application of the statute violates either the internal improvements clause or the credit clause of Article X, Section 10 of the Constitution of Virginia.

Concluding that Code § 33.1-221.1:1.1, as applied in this case, does not violate the subject provisions of Article X, Section 10, we will affirm the judgment of the circuit court awarding summary judgment in favor of appellees.

## I. BACKGROUND

### A. Legislative Intent for Shifting Highway Truck Traffic to Rail

More than a decade ago, the General Assembly expressed its concern over the growing congestion of heavy truck traffic on the highways in Virginia.  In House Joint Resolution No. 704 from the 1999 legislative session, the General Assembly indicated that, through utilization of the Virginia Port Authority's Inland Port at Front Royal, the Port Authority collected truck-hauled containerized freight "in sufficient quantities to transport it in unit trains directly to the Ports of Hampton Roads."  H. J. Res. 704, Va. Gen. Assem. (Reg. Sess. 1999).  This mechanism, according to the General Assembly, resulted in "not only holding down costs paid by the shipper, but also eliminating a substantial number of trucks from the overcrowded long-haul highways of eastern Virginia."  Id.

3

Pointing to this example, the General Assembly declared, "a network of intermodal transfer facilities might be established that could prove useful in reducing heavy truck traffic on other long-haul highways in the Commonwealth, particularly Interstate Route 81."[1]  Id.  In addition, some of the intermodal facilities "might employ a variety of 'piggy-back' container, trailer, or semitrailer configurations."  Id.

Accordingly, the General Assembly tasked Virginia's Secretary of Transportation, in conjunction with the Virginia Department of Transportation and DRPT, "to study the desirability and feasibility of establishing additional intermodal transfer facilities"; and to submit findings and recommendations from the study to the Governor and the 2001 Session of the General Assembly.  Id.

The following year, in Senate Joint Resolution No. 55 from the 2000 legislative session, the General Assembly again addressed the traffic problem on Virginia's interstates.  S. J. Res. 55, Va. Gen. Assem. (Reg. Sess. 2000).  The General Assembly declared that "many of the Commonwealth's interstate highways are experiencing an erosion of safety as a result of

---

[1] "Intermodal" transportation can be defined as "the shipment of cargo and the movement of people involving more than one mode of transportation during a single, seamless journey." W. Brad Jones, C. Richard Cassady & Royce O. Bowden, Jr., Developing a Standard Definition of Intermodal Transportation, 27 Transp. L.J. 345, 349 (2000).

staggering increases in traffic."  Id.  An "acute example" of this problem, the General Assembly explained, was Interstate 81, which was designed "to carry no more than 15 percent of its total traffic volume as truck traffic, but whose current traffic is made up of as much as 40 percent trucks."  Id.

The General Assembly further declared that widening Interstate 81 alone was estimated to cost in excess of three billion dollars and take at least ten years to complete, and that similar improvements to Virginia's other interstates would have comparable costs and completion times.  In an effort to provide an alternative measure that would "alleviate the excessive volumes of traffic" on Interstate 81 and Virginia's other interstate highways, the General Assembly determined that it may be "both desirable and feasible" to "shift traffic on our highways to trains on our railroads."  Id.

The General Assembly thus requested that the Secretary of Transportation expand her study regarding the establishment of additional intermodal transfer facilities, pursuant to  1999 House Joint Resolution No. 704, "to include the potential for shifting Virginia's highway traffic to railroads."  Id.

In 2001, the Secretary of Transportation issued a report to the Governor and the General Assembly presenting the results of the study commissioned by the General Assembly pursuant to the two resolutions described above.  See Commonwealth of Va., Sec'y

of Transp., The Potential for Shifting Virginia's Highway Traffic to Railroads, S. Doc. No. 30 (2001).  The Secretary explained in the report that a variety of data was collected on truck movements, Interstate 81 improvement plans, and railroad plans.  Analyses were then conducted to determine "the reasonableness of both highway and railroad plans and cost estimates, the amount of highway traffic which might be diverted to rail, and the extent to which those diversions might impact I-81."  Id. at 5.  Based on the study, the Secretary ultimately recommended in her report, among other things, that the Commonwealth "fully consider proposals advanced to divert highway traffic to rail transportation" in light of "the potential for significant public benefits."  Id. at 36.

In 2005, through House Joint Resolution No. 789, the General Assembly declared its support for such a proposal in the form of a major multi-state initiative between Virginia, West Virginia and Ohio, called the Heartland Corridor.  H. J. Res. 789, Va. Gen. Assem. (Reg. Sess. 2005).  As described in the resolution: "the Heartland Corridor proposes the development of a seamless, efficient rail intermodal route from an Atlantic Ocean gateway, opening up a significant portion of western Virginia and West Virginia currently excluded from international intermodal markets, . . . and connecting to a center of existing domestic and international distribution in the Midwest, thereby

6

strengthening the economic vitality and improving the efficiency and capacity of Virginia's and the nation's transportation network." Id.

According to the General Assembly, this newly designated railway corridor would allow intermodal containerized traffic to "move directly across the heartland" from the ports in Hampton Roads to the Midwest. Id. Further, these containers could be double-stacked on trains – a key feature of the corridor – as a result of the construction of new clearance levels along the corridor. Id.

The Roanoke Valley would be among the locations gaining direct connection, via rail, to both the Virginia ports and the Midwest, the legislature further declared. This would be accomplished by the provision of an "intermodal ramp" in the Roanoke Valley region. Id. As explained in the resolution, rail intermodal transportation requires such "ramp facilities for the seamless transfer of rail-to-truck and the reverse"; and such facilities "must be well situated relative to other infrastructure, most critically, roadway connectors." Id.

Upon completion, the General Assembly also declared, the Heartland Corridor would divert freight away from highways and onto trains in the double-stacked intermodal containers. Id. In doing so, the corridor would not only benefit the Commonwealth by way of economic development, it would also

7

"benefit the traveling public and address congestion by growing freight opportunities via rail instead of road (alleviating the magnitude of higher highway maintenance costs)." Id. In short, the corridor, according to the General Assembly, "will play an important role in diverting highway traffic" to rail. Id.

The General Assembly concluded this resolution by declaring support for the Heartland Corridor project upon the recognition that it would "require a public-private partnership to bring [the project] to fruition." Id. The General Assembly further indicated that this partnership should include, among others, the Commonwealth and Norfolk Southern. Id.

### B. Rail Enhancement Fund Created
### by Code § 33.1-221.1:1.1

In the midst of declaring its support for intermodal transportation initiatives that would divert highway traffic to railroads, the General Assembly, in 2004, enacted Code § 33.1-221.1:1.1. See 2004 Acts ch. 621. Under this statute, the Railway Preservation and Development Fund, now called the Rail Enhancement Fund (the "Fund"), was established.[2] This is the statutory funding scheme that appellants challenge on appeal in the limited context of DRPT's agreement (explained in section C below) to fund a portion of Norfolk Southern's development of an

---

[2] See 2005 Acts ch. 323 (changing name of the Fund from "Railway Preservation and Development Fund" to "Rail Enhancement Fund").

8

intermodal facility in Montgomery County as part of the Heartland Corridor project.

In subsection A of Code § 33.1-221.1:1.1, the General Assembly expressly "declares it to be in the public interest that railway preservation and development of railway transportation facilities are an important element of a balanced transportation system of the Commonwealth for freight and passengers and . . . that the retention, maintenance, improvement and development of freight and passenger railways are essential to the Commonwealth's continued economic growth, vitality, and competiveness in national and world markets . . . ."  Code § 33.1-221.1:1.1(A).

As provided in subsection B, the Fund is supported by proceeds from various dedications and appropriations, as determined by the General Assembly from time to time, which are "paid into the state treasury and credited to the Fund."  Code § 33.1-221.1:1.1(B).

Pursuant to subsection C, the Fund is administered by the Director of DRPT, subject to the approval of CTB for the expenditures from the Fund.  Code § 33.1-221.1:1.1(C). Permitted expenditures include, inter alia, those for "acquiring, leasing, and/or improving railways or railroad equipment . . . or facilities, or assisting other appropriate entities to acquire, lease, or improve railways or railroad

9

equipment . . . or facilities, for freight and/or passenger rail transportation purposes whenever the Board shall have determined that such acquisition, lease, and/or improvement is for the common good of a region of the Commonwealth or the Commonwealth as a whole." Id.

Finally, under subsection D, projects undertaken pursuant to this statute are further limited to those that CTB has determined "will result in public benefits to the Commonwealth or to a region [thereof] that are equal to or greater than the investment of funds under [the statute]." Code § 33.1-221.1:1.1(D). Such public benefits must include "the impact of the project on traffic congestion, environmental quality, and whenever possible, give due consideration to passenger rail capacity on corridors . . . that have existing or proposed passenger rail service." Id. In addition, a private source, which may include, among others, a railroad, must provide a minimum of 30 percent cash or in-kind matching contribution toward the cost of the project. Id.

### C. Agreement Between DRPT and Norfolk Southern Pursuant to Code § 33.1-221.1:1.1

In October 2005, after the General Assembly had passed the joint resolution earlier in the year supporting the Heartland Corridor project, Norfolk Southern applied to DRPT for a grant from the Fund under Code § 33.1-221.1:1.1. The grant was to be

10

used for payment of capital costs incurred for components of the Heartland Corridor project located in Virginia. Norfolk Southern requested $22,350,000 (and pledged the statutorily required 30% match) for (i) the construction of a "rail/highway intermodal facility" in the Roanoke region, so as to provide western Virginia access to "rail intermodal service" along the corridor; and (ii) the enlargement of four tunnels, so as to provide double-stack container clearance on the railroad company's main line along the Virginia section of the corridor. According to Norfolk Southern, this intermodal facility would "serve both the east-west traffic flows of the Heartland Corridor as well as future north-south flows . . . associated with the I-81 corridor." Norfolk Southern represented to DRPT that without this grant to "close the funding gap" it would not undertake these improvements to the corridor.

In December 2005, CTB, based on a recommendation by DRPT, voted to provide funding pursuant to Code § 33.1-221.1:1.1 for a number of infrastructure projects, including the rail/highway intermodal facility in the Roanoke Valley region. DRPT's recommendation was based on the required statutory criteria that the projects enhance the rail transportation network as well as remove trucks from Virginia's highways. CTB concluded that "these projects will result in public benefits to the Commonwealth as well as various regions of the Commonwealth in

11

which these projects are located, and serves the public purpose."

In May 2006, following approval of Norfolk Southern's grant application by DRPT and CTB, DRPT and Norfolk Southern entered into an agreement pursuant to Code § 33.1-221.1:1.1 (the "Agreement"). Under the Agreement, DRPT granted $22,350,000 from the Fund to Norfolk Southern for the proposed Heartland Corridor project. A subsequent amendment in 2009 provided for an additional $4,410,000 paid by DRPT to Norfolk Southern from the Fund.

Norfolk Southern certified in the Agreement that it owns or will own or control the property on which the project improvements – the "Roanoke region intermodal facility" and the enlarged tunnels on the main line – will be constructed; and that it will protect DRPT's interest in the project.[3] The Agreement provided that DRPT "has an interest in ensuring that [these] improvements created by the [p]roject continue to be operated for their intended purpose for the duration of the [p]erformance [p]eriod" (15 years, starting from the project completion date).

If the project does not result in at least 150,000 additional containers a year moving through the Heartland

_____

[3] A site in Montgomery County near Interstate 81 was selected for the location of the development of the rail/highway intermodal facility pursuant to the terms of the Agreement.

12

Corridor after the fifth year following completion of the improvements, the Agreement provided that Norfolk Southern must reimburse DRPT a prorated amount according to a formula specified in the Agreement.  In addition, if Norfolk Southern abandons or ceases to operate the improvements within the performance period, DRPT "shall be reimbursed the value of its interest in the portion of the [p]roject abandoned or discontinued."  Also, in the event of a sale of one or more of the improvements purchased using funds provided to Norfolk Southern under the Agreement, DRPT shall be "repaid a share of the sale proceeds proportionate to its share of the original purchase price" unless the property continues in operation by another entity consistent with the agreement.

## II. ANALYSIS

### A. County's Assignments of Error

On appeal, the County does not make a facial challenge to Code § 33.1-221.1:1.1, as it did below.  It does not argue "that no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications."  Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 (2008) (citation and internal quotation marks omitted); see Jaynes v. Commonwealth, 276 Va. 443, 453, 666 S.E.2d 303, 308 (2008).  Rather, the County confines its challenge under Article X, Section 10 of the

13

Constitution of Virginia to the constitutionality of the statute's application to the facts of this case. See Volkswagen of Am., Inc. v. Smit, 279 Va. 327, 336, 689 S.E.2d 679, 684 (2010) (addressing "as-applied" constitutional challenges).

The County here argues that the circuit court erred by upholding the constitutionality of Code § 33.1-221.1:1.1 in authorizing DRPT to grant funds to Norfolk Southern for the development of the Montgomery County rail/highway intermodal facility under the terms of the Agreement. According to the County, the Commonwealth was expressly prohibited from entering into such an agreement under the restrictions of both the internal improvements clause and the credit clause contained in Article X, Section 10.

The County asserts the circuit court erred because: (i) under the Agreement, DRPT will be a party to and have an interest in a privately owned and operated railroad terminal in violation of the internal improvements clause; (ii) development of the terminal is not a governmental function excepting it from the internal improvements clause; and (iii) under the Agreement, the Commonwealth will grant its credit to a private railroad company for the development of the terminal in violation of the credit clause.[4]

_____

[4] Though funding for Norfolk Southern's costs associated with enlarging four tunnels, as part of the Heartland Corridor

14

## B. Standard of Review

The County's constitutional arguments are questions of law that we review de novo. Copeland v. Todd, 282 Va. 183, 193, ___ S.E.2d ___, ___ (2011); Covel v. Town of Vienna, 280 Va. 151, 163, 694 S.E.2d 609, 617 (2010). In conducting this review, we are guided by settled principles of statutory construction. "[W]hen, as here, the constitutionality of a statute is challenged, our determination of legislative intent is guided by the recognition that all actions of the General Assembly are presumed to be constitutional." Copeland, 282 Va. at 193, ___ S.E.2d at ___ (citations and internal quotation marks omitted). There is, indeed, no stronger presumption known to the law. FFW Enters. v. Fairfax County, 280 Va. 583, 590, 701 S.E.2d 795, 799-800 (2010); Reynolds v. Milk Comm'n of Va., 163 Va. 957, 966, 179 S.E. 507, 510 (1935); Whitlock v. Hawkins, 105 Va. 242, 248, 53 S.E. 401, 403 (1906)).

Accordingly, this Court must resolve "any reasonable doubt regarding a statute's constitutionality in favor of its validity." Supinger v. Stakes, 255 Va. 198, 202, 495 S.E.2d

project, was included in the Agreement, no issue regarding that part of the Agreement is before us on appeal. The only issue in this appeal is the constitutionality of Code § 33.1-221.1:1.1's authorization of funding for the Montgomery County rail/highway intermodal facility under the terms of the Agreement. Thus, all discussion in this opinion regarding the constitutionality of the statute's application is to be understood as limited to the context of the Agreement's grant of funds to Norfolk Southern for the development of the intermodal facility.

813, 815 (1998) (citing <u>Blue Cross of Va. v. Commonwealth</u>, 221 Va. 349, 358, 269 S.E.2d 827, 832 (1980); <u>see</u> <u>FFW Enters.</u>, 280 Va. at 590, 701 S.E.2d at 800.  Further, "[a]ny 'judgment as to the wisdom and propriety of a statute is within the legislative prerogative,' and this Court 'will declare the legislative judgment null and void only when the statute is plainly repugnant to some provision of the state or federal constitution.' "  <u>Supinger</u>, 255 Va. at 202, 495 S.E.2d at 815 (quoting <u>Blue Cross of Va.</u>, 221 Va. at 358, 269 S.E.2d at 832); <u>see</u> <u>City of Newport News v. Elizabeth City County</u>, 189 Va. 825, 831, 55 S.E.2d 56, 60 (1949)); <u>Shenandoah Lime Co. v. Governor of Va.</u>, 115 Va. 865, 867-68, 80 S.E. 753, 753 (1914).

### C. Internal Improvements Clause

We turn first to the County's argument that the development of the rail/highway intermodal facility under the terms of the Agreement is not a governmental function excepted from the internal improvements clause, and thus violates this constitutional provision.

The internal improvements clause, set forth in Article X, Section 10 of the Constitution of Virginia,[5] provides: "nor shall

---

[5] Article X, Section 10 of the Constitution of Virginia states in its entirety:
§ 10.  Lending of credit, stock subscriptions, and works of internal improvement.
Neither the credit of the Commonwealth nor of any county, city, town, or regional government

16

the Commonwealth become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work."

This prohibition, along with the one set forth in the credit clause, dates back to the 1869 Constitution. See Va. Const. art. X, §§ 12, 15 (1869). It was a response to substantial financial losses the Commonwealth had sustained in previous years from its general investments in entities such as canal, turnpike and railroad companies, engaged in various large scale projects in Virginia, i.e., "works of internal improvement." Almond v. Day, 197 Va. 782, 787, 91 S.E.2d 660, 664 (1956) (Almond I). Faced with those losses, the Constitutional Convention for the 1869 Constitution "resolved

---

shall be directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation; nor shall the Commonwealth or any such unit of government subscribe to or become interested in the stock or obligations of any company, association, or corporation for the purpose of aiding in the construction or maintenance of its work; nor shall the Commonwealth become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work; nor shall the Commonwealth assume any indebtedness of any county, city, town, or regional government, nor lend its credit to the same. This section shall not be construed to prohibit the General Assembly from establishing an authority with power to insure and guarantee loans to finance industrial development and industrial expansion and from making appropriations to such authority.

that the State should no longer lend its support to such undertakings but should leave them to private enterprise," including the construction of public roads.  Almond v. Day, 199 Va. 1, 7, 97 S.E.2d 824, 829 (1957) (Almond II).

In the 1902 Constitution, however, the internal improvements clause was revised to expressly "except public roads" from its restrictions on the Commonwealth.  Va. Const. art. XIII, § 185 (1902).  The public roads exception was then retained when the current version of the Constitution was adopted in 1971.[6]

By removing the prohibition on the Commonwealth from again "becoming interested in public roads," the 1902 Constitution "restore[d] full control of that governmental power to the legislature," Almond v. Gilmer, 188 Va. 822, 837, 51 S.E.2d 272, 277 (1949); and that authority continues under our current Constitution.  Indeed, we have made clear that "[t]he construction, maintenance and operation of a highway system is a governmental function.  Unless abridged by the Constitution, that inherent power exists in the State by virtue of its

---

[6] With the addition of a "public parks" exception to the 1902 Constitution by amendment in 1928, the internal improvements clause in the current version of the Constitution of Virginia is the same as it appeared in the amended 1902 Constitution.  See Va. Const. art. XIII, § 185 (1902) (amended as provided in 1928 Acts ch. 205, ratified by election held June 19, 1928).

18

sovereignty."  Id. at 836, 51 S.E.2d at 277.  See generally 2
A. E. Dick Howard, Commentaries on the Constitution of Virginia
1126-35 (1974).

Thus, the County's challenge to Code § 33.1-221.1:1.1's
authorization of funding for the development of the rail/highway
intermodal facility under the Agreement, based on an alleged
violation of the internal improvements clause, must be rejected
if the development can be reasonably deemed an exercise of the
Commonwealth's governmental function of constructing,
maintaining and operating its highway system.  As such, the
development would fall within the public roads exception to the
internal improvements clause.  See, e.g., Almond II, 199 Va. at
5-10, 97 S.E.2d at 827-31 (holding that statutory authorization
to State Highway Commission to provide bus service through or
over bridge-tunnel project was a governmental function linked to
State highway operations and, therefore, statute was not in
violation of internal improvements clause).

The declarations of the General Assembly in the resolutions
described above supporting intermodal transportation
initiatives, the policy statement to similar effect in Code
§ 33.1-221.1:1.1, and the statute's authorization for funding
facilities like the Montgomery County intermodal facility, all
combine to evince the General Assembly's judgment and intent
underlying the statute in its provision of funds for such

19

facilities.  The General Assembly has made a policy determination that intermodal facilities such as the one proposed for Montgomery County should be developed and integrated with Virginia's highway system as "roadway connectors" - with the goal of establishing an intermodal transportation system in Virginia that provides for "the seamless transfer of rail-to-truck and the reverse."  H. J. Res. 789, Va. Gen. Assem. (Reg. Sess. 2005).  Under this system, Virginia's highways and railroads would become inextricably interconnected in the shipment of freight between road and rail, with the intermodal facility serving as the point of transition. The General Assembly's clearest statement of support for such a system was set forth in House Joint Resolution No. 789, in 2005, where it endorsed the multi-state Heartland Corridor initiative; and that resolution was, in fact, passed shortly before Norfolk Southern submitted its application to DRPT for the funding of the Heartland Corridor projects in Virginia, which included the development of the Montgomery County intermodal facility. Furthermore, when the General Assembly declared its support for the Heartland Corridor, it specifically identified the Roanoke Valley region as the location for an intermodal facility.

The General Assembly also made clear that it supports the development of intermodal facilities as a means of relieving Virginia's highways of congestion from excessive truck traffic,

20

and particularly Interstate 81.  Indeed, if the rail/highway intermodal facility in Montgomery County were utilized for the diversion of truck traffic from road to rail on the level intended by the General Assembly, it would mean that, through its support for the development of this facility, the Commonwealth would have effectively purchased a significant amount of additional capacity for traffic on Interstate 81. This diversion of truck traffic from road to rail, according to the General Assembly, would also "alleviat[e] the magnitude of higher highway maintenance costs."  H. J. Res. 789, Va. Gen. Assem. (Reg. Sess. 2005).  In furtherance of these legislative objectives, Code § 33.1-221.1:1.1, in fact, requires, inter alia, that the projects funded pursuant to the statute must benefit the public by their "impact . . . on traffic congestion."  Code § 33.1-221.1:1.1(D).

Pursuant to Code § 33.1-221.1:1.1, these legislative objectives were incorporated into the terms of the Agreement. First, the Agreement provided for the development of a rail/highway intermodal facility in Montgomery County through a DRPT grant funding a substantial portion of Norfolk Southern's capital costs for that development.  Second, the Agreement also imposed performance objectives upon Norfolk Southern to operate the facility in such a way as to effectuate a large scale diversion of truck traffic from Interstate 81 to rail under a

21

specific time frame.  If the performance objectives are not met, Norfolk Southern would be required to reimburse DRPT a prorated amount of the funding it received from DRPT according to a formula specified in the Agreement.

Giving Code § 33.1-221.1:1.1 its requisite presumption of constitutionality under our governing standard of review, we thus conclude that the funding for the facility under the Agreement was authorized pursuant to legislation intended to be directly related to the construction, maintenance and operation of Virginia's highways. Therefore, we hold that the statute's application in this case did not violate the internal improvements clause because it comes within the public roads exception.

In so holding, we reject the County's further argument that the development of the Montgomery County intermodal facility cannot be a governmental function where the facility is to be owned and operated by Norfolk Southern.[7]

When Code § 33.1-221.1:1.1 was originally enacted in 2004, it contained language, in what was then subsection E, requiring that the tracks and facilities constructed, and the property and

---

[7] Under the Agreement, the Commonwealth retains an interest in the Montgomery County intermodal facility in the form of remedies it may enforce by way of set formulas for prorated repayment in the event (i) Norfolk Southern does not meet its performance goals, (ii) the facility is abandoned, or (iii)the facility is sold and its operation discontinued.

equipment purchased, pursuant to the statute had to be owned by the Commonwealth for the life of the project. See 2004 Acts ch. 621. That language was deleted from the statute the following year. See 2005 Acts ch. 323.

The General Assembly necessarily made the determination that a facility such as the rail/highway intermodal facility in Montgomery County could provide the desired public benefits with the railroad owning and operating the facility when it amended Code § 33.1-221.1:1.1 in 2005 by deleting the requirement that the Commonwealth own the facilities funded under the statute. See 2005 Acts ch. 323. That determination was within the prerogative of the legislature, and is not one that we may disturb, as we do not find it repugnant to the internal improvements clause under our narrow standard of review. "Whether an enactment is wise, and matters of policy, are questions for the legislative branch of government, and not the judicial branch." Horner v. Dep't of Mental Health, Mental Retardation, & Substance Abuse Servs., 268 Va. 187, 193, 597 S.E.2d 202, 205 (2004); see Danville Warehouse Co. v. Tobacco Growers' Co-op. Ass'n, 143 Va. 741, 761, 129 S.E. 739, 745 (1925) (explaining that the "wisdom, expediency [or] justice" of

23

a statute are questions to be determined by the legislature, not

by the courts (citation and internal quotation marks omitted)).[8]

---

[8] We note that this Court has not held in any of its decisions addressing the public roads exception to the internal improvements clause that private ownership of the particular facility at issue was a dispositive factor in deciding whether a violation of this constitutional provision had occurred. In the cases cited by the County in support of its private ownership argument, Gilmer (ferry facilities), Almond II (bus facilities), Harrison v. Day (Harrison I), 200 Va. 750, 107 S.E.2d 585 (1959) (local government produce markets), Harrison v. Day (Harrison II), 200 Va. 764, 107 S.E.2d 594 (1959) (port and harbor facilities), and Harrison v. Day (Harrison III), 202 Va. 967, 121 S.E.2d 615 (1961) (same), all of the facilities at issue were already owned, or were to be owned, by the Commonwealth or a political subdivision thereof. Thus, the issue of private ownership, in the context of the internal improvements clause, was not before this Court for review in any of those cases.

The ratio decidendi of Harrison III is indeed supportive of our holding in this case. There, one of the issues was whether the Virginia State Ports Authority (Authority) was in violation of the internal improvements clause by leasing, pursuant to the Code, the Authority's port and harbor facilities in Hampton Roads to the Norfolk and Western Railway Company (Norfolk Western) for operation as general cargo port facilities. Id. at 968-71, 121 S.E.2d at 616-17. Having already decided in Harrison II that the Authority did not violate the internal improvements clause by acquiring and operating the port and harbor facilities on the basis that those undertakings were an exercise of a governmental function, this Court held in Harrison III that the leasing of the facilities to Norfolk Western also constituted no such violation. Id. at 972-73, 121 S.E.2d at 618-19. In reaching that decision, we reasoned: "That the enterprise is a governmental function and for a public purpose has been affirmed by this [C]ourt. If the public purpose can, in the judgment of the Authority, be better accomplished through [leasing the facilities] than through the operation of the enterprise by the Authority itself, there is no good reason and no constitutional obstacle against the exercise of this power to lease." Id. at 972, 121 S.E.2d at 618-19. "It is not our function," we concluded, "to decide whether it is a wise policy for the Authority to lease this facility rather than to operate

24

D. Credit Clause

The County's alternative constitutional challenge to Code § 33.1-221.1:1.1's application in this case is the contention that DRPT's grant of funds to Norfolk Southern for the development of the Montgomery County intermodal facility violated the credit clause under Article X, Section 10 of the Constitution of Virginia.  The credit clause provides that "[n]either the credit of the Commonwealth nor of any county, city, town, or regional government shall be directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation."  Va. Const. art. X, § 10.

Given, again, our governing standard of review, we conclude that this alternative challenge must also fail.  Simply put, DRPT's grant to Norfolk Southern for the development of the

_____

it itself.  Courts have nothing to do with the wisdom of legislation."  Id. at 972-73, 121 S.E.2d at 619.
   The same can be similarly said of the legislature's determination, expressed through Code § 33.1-221.1:1.1, to provide funding for the development of the Montgomery County intermodal facility while leaving its ownership and operation to Norfolk Southern.  We have concluded that DRPT's undertakings to effect the development of the facility were an exercise of the Commonwealth's governmental function, and for the public purpose, of constructing, maintaining and operating its highway system in an efficient and effective manner.  Like our view of the leasing of the ports and harbor facilities to Norfolk Western in Harrison III, we see no constitutional obstacle against the Commonwealth in allowing the governmental function and public purpose implicated here to be accomplished with Norfolk Southern owning and operating the intermodal facility pursuant to the terms and restrictions of the Agreement.

25

intermodal facility was only that, a grant, and not an extension of the Commonwealth's credit to Norfolk Southern. Indeed, it was effectively a purchase by the Commonwealth of additional traffic capacity for Interstate 81.

Analyzing the credit clause in Article X, Section 10, this Court in Almond I quoted with approval the following definition to be applied to the credit clause, which the Idaho Supreme Court used for its construction of a similar phrase " 'lend or pledge the credit' " under the Idaho Constitution:

> "In the popular sense, lending or loaning money or credit is at once understood to mean a transaction creating the customary relation of borrower and lender, in which the money is borrowed for a fixed time, and the borrower promises to repay the amount borrowed at a stated time in the future, with interest at a fixed rate. And that is the sense, then, in which the language employed in those sections must be understood, and so understood, no county, for example, shall lend or pledge its credit or faith directly or indirectly, or in any manner which would create the customary relation of borrower and lender."

Almond I, 197 Va. at 790-91, 91 S.E.2d at 667 (quoting Bannock County v. Citizens' Bank and Trust Co., 22 P.2d 674, 680 (Idaho 1933)).

Thus, in the absence of an extension of actual credit by the Commonwealth, the credit clause does not apply. See Reasor v. City of Norfolk, 606 F. Supp. 788, 795-97 (E.D. Va. 1984) (in deciding whether the challenged activities violated the credit

26

clause, federal district court, relying on Almond I, explained that term "credit" under Article X, Section 10 "refers to the relation of borrower and lender, in which money is borrowed to be repaid at a later date").

Button v. Day, 208 Va. 494, 495-505, 158 S.E.2d 735, 736-42 (1968) is the only decision of this Court holding that a challenged funding scheme was in violation of the credit clause. As the funding scheme at issue here under Code § 33.1-221.1:1.1 does not extend any credit to Norfolk Southern, nor guarantee any default on the part of the railroad, it does not resemble the funding scheme in Button.[9]

Finally, we do not view the Commonwealth's remedial interests in the Montgomery County intermodal facility under the terms of the Agreement as in any way transforming the grant or purchase into an extension of credit.

---

[9] We held in Button that the General Assembly's appropriation of funds to a guaranty fund, and the Virginia Industrial Building Authority's guaranty of loans for industrial projects based upon the strength of that fund, violated the credit clause. Id. at 495-505, 158 S.E.2d at 736-42. This statutory funding scheme was constitutionally prohibited because it provided for State funds to be reserved "for the sole purpose of guaranteeing future payment of defaulted loans of private debtors." Id. at 504, 158 S.E.2d at 741. This particular funding scheme was then, in fact, made constitutional three years later under our current Constitution, in Article X, Section 10, by expressly permitting the General Assembly to "establish[] an authority with power to insure and guarantee loans to finance industrial development and industrial expansion and [to] mak[e] appropriations to such authority." Va. Const. art. X, § 10.

27

## III. CONCLUSION

For these reasons, we conclude that Code § 33.1-221.1:1.1, as applied in this case, does not violate either the internal improvements clause or the credit clause of Article X, Section 10 of the Constitution of Virginia.  Accordingly, we will affirm the judgment of the circuit court denying summary judgment to the County and awarding summary judgment in favor of appellees, DRPT, the Director of DRPT, CTB, and Norfolk Southern.

<u>Affirmed.</u>