PRESENT: Powell, Kelsey, McCullough, Chafin, and Mann, JJ., and Millette and Mims, S.JJ.

NORFOLK SOUTHERN RAILWAY COMPANY

v. Record No. 240869

OPINION BY
JUSTICE TERESA M. CHAFIN
MAY 22, 2025

STATE CORPORATION COMMISSION, ET AL.

FROM THE STATE CORPORATION COMMISSION

Norfolk Southern Railway Company ("Norfolk Southern") challenges the constitutionality of Code § 56-16.3, a statute that permits broadband service providers to install fiber optic cables across railroad property. As applied in this case, Code § 56-16.3 authorizes a private broadband service provider to take railroad property for a nonpublic use. We hold that the challenged application of Code § 56-16.3 violates Article I, Section 11 of the Constitution of Virginia.

## I. BACKGROUND

### A. THE CHALLENGED STATUTE

In 2023, the General Assembly enacted Code § 56-16.3 to promote the expansion of broadband services in the Commonwealth. 2023 Va. Acts chs. 713, 714. The statute provides a framework that allows a broadband service provider[1] to install fiber optic cables across railroad property. *See generally* Code § 56-16.3.

---

[1] For the purposes of Code § 56-16.3, a "broadband service provider" is:

> (i) an entity that provides broadband service through the utilization of a fiber optic broadband line, coaxial cable, or other wireline system or (ii) a Phase I or Phase II Utility, as those terms are defined in subdivision A 1 of [Code] § 56-585.1, or a cooperative, as defined in [Code] § 56-231.15, that provides middle-mile infrastructure to Internet service providers.

Code § 56-16.3(A).

In order to proceed under Code § 56-16.3, a broadband service provider must submit an application for a proposed crossing. *See* Code § 56-16.3(B), (C).

> If a broadband service provider deems it necessary in the construction of its systems to cross the works of a railroad company, including its tracks, bridges, facilities, and all railroad company rights of way or easements, then the broadband service provider shall submit an application for such crossing to the railroad company.

Code § 56-16.3(B). The application must include specific engineering plans and set forth certain details concerning the proposed crossing and construction project. *See* Code § 56-16.3(C)(1).

The proposed crossing must be:

> (i) located, constructed, and operated so as not to impair, impede, or obstruct, in any material degree, the works and operations of the railroad to be crossed; (ii) supported by permanent and proper structures and fixtures; and (iii) controlled by customary and approved appliances, methods, and regulations to prevent damage to the works of the railroad and ensure the safety of its passengers.

Code § 56-16.3(D). Furthermore, the broadband service provider must ensure that the proposed crossing is "constructed and operated in accordance with accepted industry standards." Code § 56-16.3(F).

The broadband service provider is responsible for the costs of the proposed crossing, and it must reimburse the railroad company for its direct expenses. Code § 56-16.3(G). Additionally, the broadband service provider must pay a capped license fee to the railroad company for certain proposed crossings. Code § 56-16.3(G), (I). If the proposed crossing is located within a public right-of-way, however, the broadband service provider is not required to pay any license fee to the railroad company. Code § 56-16.3(K).

The railroad company must approve the broadband service provider's application within 35 days of its receipt, unless the railroad company files a petition for relief with the State

2

Corporation Commission (the "Commission"). Code § 56-16.3(C)(4). The Commission has "sole jurisdiction to hear and resolve claims between railroad companies and broadband service providers concerning crossings and [Code § 56-16.3]." Code § 56-16.3(H).

> If the railroad company asserts that (i) the license fee is not adequate compensation for the proposed crossing, (ii) the proposed crossing will cause undue hardship on the railroad company, or (iii) the proposed crossing will create the imminent likelihood of danger to public health or safety, then the railroad company may petition the Commission for relief and provide simultaneous notice to the broadband service provider within 35 days from the date of the broadband service provider's application.

*Id.* The railroad company may also file a petition requesting additional reimbursement for expenses exceeding $5,000. Code § 56-16.3(G). The Commission must adjudicate a railroad company's petition and issue a final order within 90 days of the initial filing of the petition. Code § 56-16.3(H).

The provisions of Code § 56-16.3 apply "notwithstanding any contrary or other provision of law." Code § 56-16.3(M). Moreover, the provisions of the statute are to be "liberally construed . . . in favor of broadband expansion." Code § 56-16.3(N).

## B. THE CHALLENGED CROSSINGS

In the spring of 2024, Cox Communications Hampton Roads, LLC ("Cox"), filed three applications to install fiber optic cables across Norfolk Southern's railroad tracks in New Kent County. Cox intended to run the fiber optic cables through underground conduits that would be installed beneath the railroad tracks. After reviewing the applications, Norfolk Southern advised Cox that it did not object to the proposed crossings. Norfolk Southern forwarded a draft licensing agreement to Cox, requesting license fees for the proposed crossings that exceeded the capped license fees set forth in Code § 56-16.3.

3

Cox refused to execute Norfolk Southern's licensing agreement, asserting that the proposed crossings and corresponding license fees were governed by Code § 56-16.3. Cox advised Norfolk Southern that it intended to proceed with the construction of the crossings without entering into the licensing agreement.

Norfolk Southern filed a petition for relief with the Commission. Among other things, Norfolk Southern asserted that Code § 56-16.3 violated Article I, Section 11 of the Constitution of Virginia. Emphasizing that Cox was a private, for-profit company, Norfolk Southern maintained that the application of Code § 56-16.3 effectuated a taking of its property for a nonpublic use. Norfolk Southern also argued that Code § 56-16.3 eliminated the condemnor's burden to establish the public use underlying a proposed taking.

The Commission rejected Norfolk Southern's arguments without holding a hearing concerning the matter. The Commission explained that the allegations set forth in Norfolk Southern's petition were "both legally and factually" insufficient to establish an "undue hardship." Therefore, the Commission concluded that the proposed crossings would not impose an "undue hardship" upon Norfolk Southern.

Norfolk Southern noted an appeal to this Court. The Commission subsequently stayed its judgment during the pendency of the appeal, observing that Norfolk Southern's challenge to the constitutionality of Code § 56-16.3 presents an issue of first impression in the Commonwealth.

## II. ANALYSIS

On appeal, Norfolk Southern contends that Code § 56-16.3 violates Article I, Section 11 of the Constitution of Virginia. This argument presents a question of law that is subject to de novo review. *Old Dominion Comm'n for Fair Util. Rates v. State Corp. Comm'n*, 294 Va. 168, 177 (2017).

4

A party challenging the constitutionality of a statute bears a heavy burden. "[A]ll actions of the General Assembly are presumed to be constitutional." *Id.* (quoting *Montgomery Cnty. v. Virginia Dep't of Rail & Pub. Transp.*, 282 Va. 422, 435 (2011)). When reviewing the constitutionality of a challenged statute, we "resolve any reasonable doubt regarding [the] statute's constitutionality in favor of its validity." *Id.* at 178 (quoting *Montgomery Cnty.*, 282 Va. at 435). "[A] statute will be upheld as constitutional unless it is 'plainly repugnant' to some provision of the Virginia or Federal Constitutions." *Id.* (quoting *Elizabeth River Crossings OpCo, LLC v. Meeks*, 286 Va. 286, 301 (2013)).

Eminent domain statutes, however, must be "strictly construed." *PKO Ventures, LLC v. Norfolk Redevelopment & Hous. Auth.*, 286 Va. 174, 182 (2013) (quoting *3232 Page Ave. Condo. Unit Owners Ass'n v. City of Va. Beach*, 284 Va. 639, 645 (2012)). "[I]n the construction of statutes conferring the power of eminent domain, every reasonable doubt is to be resolved adversely to that right." *Id.* (quoting *School Bd. of Harrisonburg v. Alexander*, 126 Va. 407, 413 (1919)). "The taking of private property . . . is not to be permitted except where the right is plainly conferred and the manner of its exercise has been strictly followed." *Richmond v. Carneal*, 129 Va. 388, 397 (1921) (quoting *School Bd. of Harrisonburg*, 126 Va. at 412).

In *Kelo v. City of New London*, 545 U.S. 469 (2005), the Supreme Court of the United States held that the government could take private property from its owner for economic development purposes under the pertinent provision of the Fifth Amendment of the United States Constitution.[2] *See Kelo*, 545 U.S. at 484-85. The Supreme Court recognized that "[p]romoting economic development is a traditional and long-accepted function of government." *Id.* at 484.

---

[2] The takings provision of the Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

Consequently, the Supreme Court concluded that a taking for economic development purposes could satisfy the "public use" requirement of the Fifth Amendment. *Id.* at 484-85. The Supreme Court, however, expressly acknowledged that its decision did not prohibit any State from "placing further restrictions on its exercise of the takings power" or adopting a "public use" requirement that is "stricter than the federal baseline." *Id.* at 489.

The citizens of the Commonwealth of Virginia did just that, responding to the *Kelo* decision by enacting legislation and ratifying a constitutional amendment recognizing the fundamental right to own private property. *See* 2007 Va. Acts chs. 882, 901, 926; 2011 Va. Acts ch. 757.

The Constitution of Virginia now includes robust provisions addressing the "public use" requirement underlying the exercise of the power of eminent domain. In pertinent part, Article I, Section 11 of the Constitution of Virginia states:

> [T]he General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use. No private property shall be damaged or taken for public use without just compensation to the owner thereof. No more private property may be taken than necessary to achieve the stated public use. . . . A public service company, public service corporation, or railroad exercises the power of eminent domain for public use when such exercise is for the authorized provision of utility, common carrier, or railroad services. In all other cases, a taking or damaging of private property is not for public use if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development, except for the elimination of a public nuisance existing on the property. The condemnor bears the burden of proving that the use is public, without a presumption that it is.

Va. Const. art. I, § 11.

Code § 1-219.1 sets forth similar limitations. The statute recognizes that the "right to private property [is] a fundamental right," and confirms that the "General Assembly shall not

6

pass any law whereby private property shall be taken or damaged for public uses without just compensation." Code § 1-219.1(A). Significantly, the statute defines the term "public uses,"[3] stating:

> The term "public uses" mentioned in Article I, Section 11 of the Constitution of Virginia is hereby defined as to embrace only the acquisition of property where: (i) the property is taken for the possession, ownership, occupation, and enjoyment of property by the public or a public corporation; (ii) the property is taken for construction, maintenance, or operation of public facilities by public corporations or by private entities provided that there is a written agreement with a public corporation providing for use of the facility by the public; (iii) the property is taken for the creation or functioning of any public service corporation, public service company, or railroad; (iv) the property is taken for the provision of any authorized utility service by a government utility corporation; (v) the property is taken for the elimination of blight provided that the property itself is a blighted property; or (vi) the property taken is in a redevelopment or conservation area and is abandoned or the acquisition is needed to clear title where one of the owners agrees to such acquisition or the acquisition is by agreement of all the owners.

*Id.* Code § 1-219.1 expressly permits a property owner to challenge whether a taking is for a public use during condemnation proceedings. Code § 1-219.1(E).

While recognizing certain exceptions, Code § 1-219.1 clarifies that the public use underlying an exercise of eminent domain power must exceed any incidental private gain. In pertinent part, the statute provides:

---

[3] Although the General Assembly may enact legislation addressing the term "public use," such legislation must be consistent with pertinent constitutional provisions. We must independently determine whether a taking is for a constitutionally permissible "public use," notwithstanding any statutory definitions of the term. *See, e.g.*, *Mumpower v. Housing Auth. of Bristol*, 176 Va. 426, 448 (1940) ("[W]hether a condemnation is for a public or a private use . . . is a judicial question and is subject to the review of the courts." (internal quotation marks omitted)); *Boyd v. C.L. Ritter Lumber Co.*, 119 Va. 348, 366 (1916) ("The legislature cannot make [a] use public by declaring it to be such. The question at law is whether the declared uses are in law public uses, and that is a question which the court must determine." (internal quotation marks omitted)).

7

> Except where property is taken (i) for the creation or functioning of a public service corporation, public service company, or railroad; (ii) for the provision of any authorized utility service by a government utility corporation; or (iii) for sanitary sewer, water or stormwater facilities, or transportation facilities, including highways, roads, streets, and bridges, traffic signals, related easements and rights-of-way, mass transit, ports, and any components of federal, state, or local transportation facilities, by a public corporation, property can only be taken where: (a) the public interest dominates the private gain and (b) the primary purpose is not private financial gain, private benefit, an increase in tax base or tax revenues, an increase in employment, or economic development.

Code § 1-219.1(D).

Norfolk Southern contends that Code § 56-16.3 permits Cox to take railroad property for a nonpublic use. Additionally, Norfolk Southern asserts that Code § 56-16.3 eliminates Cox's constitutionally imposed burden to establish the public use underlying the proposed taking. We agree with both of Norfolk Southern's arguments. By essentially ignoring the public use requirement set forth in Article I, Section 11 of the Constitution of Virginia and Code § 1-219.1, Code § 56-16.3 permits Cox to take Norfolk Southern's property for a private purpose.

Pursuant to the plain terms of Article I, Section 11 of the Constitution of Virginia, "[t]he condemnor bears the burden of proving that the use is public, without a presumption that it is." Despite this clear constitutional directive, Code § 56-16.3 does not even reference the term "public use." The statute permits a broadband service provider to install fiber optic cables across railroad property after it files an application to do so with the affected railroad company. *See* Code § 56-16.3(B), (C). The broadband service provider's application is not required to address the public use underlying the proposed crossing. *See* Code § 56-16.3(C)(1). Although a railroad company may petition the Commission for relief based on three specific grounds, none of these grounds address the public use of a proposed crossing. *See* Code § 56-16.3(H).

8

In the present case, the application of Code § 56-16.3 effectuates a taking of Norfolk Southern's property. The statute permits Cox to install fiber optic cables across Norfolk's Southern's railroad tracks. *See* Code § 56-16.3. These fiber optic cables would occupy a defined space under Norfolk Southern's railroad tracks for an indefinite period of time. Such a physical occupation is a taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). It is well established that "occupations of land by such installations as telegraph and telephone lines, rails, and underground pipes or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." *Id.* at 430.

The taking at issue, however, is not for a public use. As applied in this case, Code § 56-16.3 permits a private company to expand its broadband network across railroad property for financial gain. "It has been universally held that the spirit of the Constitution of Virginia . . . prohibits the taking of private property for private use under any conditions." *Phillips v. Foster*, 215 Va. 543, 546 (1975) (quoting *Boyd v. C.L. Ritter Lumber Co.*, 119 Va. 348, 351-52 (1916)).

Cox is a private, for-profit broadband service provider. It is not a government entity, public service corporation, or public service company. Therefore, Cox cannot exercise the power of eminent domain for a "public use," under either Article I, Section 11 of the Constitution of Virginia or Code § 1-219.1.

We acknowledge that the expansion of an existing broadband network may benefit the members of the public who would be served by the expansion. Nevertheless, a taking for a "public benefit" is not necessarily a taking for a "public use." *See Hoffman Family, LLC v. City of Alexandria*, 272 Va. 274, 289 (2006); *Phillips*, 215 Va. at 547. "The term 'public use' connotes a possession, occupation, and enjoyment of the land by the general public, or by public

9

agencies." *Hoffman Family, LLC*, 272 Va. at 289. "In a condemnation proceeding, the appropriate consideration is whether a public use predominates, not whether a public benefit may result."[4]  *Id.* (emphasis omitted).

Although Code § 56-16.3 cites the Commonwealth's "stated policy to promote the rapid deployment of broadband," Code § 56-16.3(G), it does not state that the crossings authorized by the statute are for a "public use."[5]  A statute addressing similar subject matter, however, has indicated that the use of an easement for the expansion of broadband services is not a "public use."  Code § 55.1-306.1 permits certain utility easements to be used for the expansion of broadband and other communication services.  While the statute recognizes that such a use of utility easements is in the "public interest," Code § 55.1-306.1(B)(2), it clarifies that "[n]othing in this section shall be deemed to make the use of an easement for broadband or other

---

[4] Over a century ago, this Court aptly observed:

> When we depart from the natural import of the term 'public use' and substitute for the simple idea of a public possession and occupation that of public utility, public interest, common benefit, general advantage, or convenience, or that still more indefinite term 'public improvement,' is there any limitation which can be set to the exertion of legislative will in the appropriation of private property?  The moment the mode of its use is disregarded and we permit ourselves to be governed by speculations upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat without any certain principle to guide us.

*Carneal*, 129 Va. at 396 (quotation omitted).

[5] Even if Code § 56-16.3 expressly stated that the crossings at issue were for a "public use," a broadband service provider would still be required to establish that the crossings were consistent with the requirements of Article I, Section 11 of the Constitution of Virginia.  As noted in *Carneal*, the General Assembly may not "make a private use public by calling it so, in order to justify the exercise of the power of eminent domain." *Carneal*, 129 Va. at 396.  Stated more generally, the General Assembly "cannot conclude the constitutionality of its own enactments." *Id.* at 394.

10

communications services . . . a public use for the purposes of [Code] § 1-219.1, or other applicable law," Code § 55.1-306.1(B)(6).

As applied in this case, Code § 56-16.3 permits a private broadband service provider to take railroad property for a nonpublic use. We hold that this application of Code § 56-16.3 violates Article I, Section 11 of the Constitution of Virginia.

III.  CONCLUSION

For the reasons stated, we reverse the judgment of the Commission and remand the case for entry of judgment in favor of Norfolk Southern.

*Reversed and remanded.*